**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**James MITCHELL, aka/Jim Mitchell,**
**Defendant–Appellant.**

No. 88–5063.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 4, 1989.

Decided Oct. 1, 1990.

---

Phillip A. Trevino, Deputy Federal Public Defender, Los Angeles, Cal., for defendant-appellant.

Janet C. Hudson, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before FLETCHER, NELSON and NORRIS, Circuit Judges.

NELSON, Circuit Judge:

Appellant James Mitchell was charged with knowingly receiving material depicting minors engaged in sexually explicit conduct in violation of the Child Protection Act, 18 U.S.C. § 2252(a)(2), following the government's targeting and soliciting him in a sting operation known as "Project Looking Glass." Mitchell moved for dismissal of his indictment on grounds of outrageous government conduct. The district court denied the motion on the grounds that appellant had been predisposed to commit the crime and that the sting operation did not constitute outrageous government conduct. Mitchell then entered a conditional guilty plea that reserved his right to appeal the outrageous government conduct issue. Mitchell appealed. The trial court had jurisdiction pursuant to 18 U.S.C. § 3231. This court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the decision of the district court.

## STANDARD OF REVIEW

A motion to dismiss an indictment on grounds of unreasonable governmental conduct is a question of law reviewed *de novo* with factual findings reviewed under the clearly erroneous standard. *United States v. Bogart*, 783 F.2d 1428, 1434 (9th Cir.), *vacated on other grounds sub nom. United States v. Wingender*, 790 F.2d 802 (1986).

## FACTUAL AND PROCEDURAL BACKGROUND

In January of 1987, James Mitchell received an unsolicited four-page application for membership in "Love Land," an orga-

nization located in Love Land, Colorado. The application described Love Land as:

a society for those who adhere to the doctrine that pleasure and happiness is the sole good in life. We believe that we have the right to read what we desire, the right to discuss similar interests with those who share our philosophy, and finally that we have the right to seek pleasure without the restrictions being placed upon us by an outdated puritan morality.

Members of Love Land were represented as entitled to receive its newsletter and to correspond and to meet with other members. No other organizational activities were mentioned.

The application had ten parts. Several of the parts required applicants to express their attitudes toward a broad spectrum of sexual and non-sexual activities. Part "D" required applicants to indicate whether they were in favor of, undecided about, or opposed to, activities alphabetically ranging from "animal training" to "water sports." Part "E" required applicants to indicate the degree of enjoyment (on a 4–point scale, with 1 being the highest) they received from fifteen types of sexually oriented materials including those presenting "pin-ups," "swingers" clubs, heterosexual activity, and homosexual activity. Part "F" asked applicants to reveal their attitudes (on a 3–point scale) about sexually explicit materials, sexual freedom in all activities, and sexual freedom for all consenting persons without any age restrictions. Part "G" asked applicants to indicate whether they enjoyed hobbies such as painting, music, and photography. Part "H" asked applicants to indicate their age at the time of their first sexual experience and to indicate what they considered to be the best age for a first sexual experience. Finally, the application said, in all capital letters, "I understand that the information which I have produced shall be held in strict confidence by the society and that all information received by me from the society shall be held in strict confidence by me." Mitchell completed and returned the questionnaire to Love Land in January of 1987.

Love Land, in fact, was not a society of people who believed that they had "the right to read what [they] desire" and "the right to discuss similar interests" with those who shared their philosophy. It was an organization created by the United States Government. The answers to the Love Land questionnaire were used in part to determine who would receive a solicitation from another phony government organization, "The Far Eastern Trading Company."

In March of 1987, Mitchell received a solicitation letter from "Far Eastern Trading Company, Ltd." of Hong Kong. The letter stated, "We have read the comments of Mr. Van Rabb of your Customs Service concerning the efforts of his agents to find 'children's pornography' and we find that many of you are denied a product because of that agency." The letter continued, "For those of you who have enjoyed youthful material from [certain publishers], we have devised a method of getting these to you without prying eyes of United States Customs seizing your mail." The letter then explained that Far Eastern's "American solicitors" had advised that it could achieve this result by mailing the material from Far Eastern's branch office in the Virgin Islands. The letter concluded, "If you want further information, please complete the following coupon and disclaimer and post it to the listed addresses." Mitchell returned this request for more information on March 30, 1987.

In early May of 1987, Mitchell received a catalog from Far Eastern. The catalog offered a selection of seven video tapes, two 8mm films, and seven magazines. One offering, entitled "Torrid Tots," was described as picturing "[v]ery young girls, some as young as five-years-old, in all kinds of seductive poses. Hard to get material." The offering also indicated that the photographs depicted children engaged in fellatio and intercourse. Mitchell mailed an order for "Torrid Tots" to Far Eastern and enclosed a ten-dollar bill. In June of 1987, Mitchell received a copy of the magazine at his post office box. When he picked up the magazine, postal inspectors followed Mitchell to his home. They then searched

Mitchell's home pursuant to a search warrant that had been issued previously by a United States magistrate. The postal inspectors seized the magazine and arrested Mitchell.

Mitchell was charged with violation of 18 U.S.C. § 2252(a)(2), knowing receipt of a visual depiction of a minor engaged in sexually explicit conduct. Following the district court's denial of his motion to dismiss for outrageous government conduct, Mitchell entered a conditional plea of guilty, pursuant to Fed.R.Crim.P. 11(a)(2). In February of 1988, the district court suspended imposition of sentence and placed Mitchell on three years of probation.

Mitchell's motion to dismiss is based upon the fact that the government's investigation of him arose out of a sting operation known as "Project Looking Glass."[1] The program was commenced by the United States Postal Inspection Service[2] to target suspected pedophiles, *United States v. Esch*, 832 F.2d 531, 533 (10th Cir.1987), and others who receive child pornography through the mails. The government set up a corporation in Hong Kong, the Far Eastern Trading Company, as an undercover child pornography mail order firm because substantial amounts of child pornography originate overseas. The government also set up a branch of the company in Frederiksted, St. Croix, U.S. Virgin Islands.

The government selected its targets for Project Looking Glass in a number of ways. These included obtaining the names of individuals suspected of purchasing pornography from certain commercial distributors, gathering the names of those who responded to advertisements placed by the government in sexually oriented magazines, and collecting the names of friends, associates, and correspondents of individuals who had been arrested for violating pornography laws. The government then tested the targets for their predisposition to receive child pornography. These tests consisted of one or more unsolicited questionnaires sent to the targets from various undercover organizations established by the government. These organizations called themselves Love Land, Crusaders for Sexual Freedom, and the American Hedonist Society.[3] These clandestine government organizations issued newsletters on sexual topics and accepted sexually oriented advertisements from members.[4] The record does not reveal the size of these organizations' memberships or the circulation of their newsletters.

The government then examined each respondent's questionnaire and determined whether to pursue the target further. Those whom the government believed had revealed pedophilic tendencies by their answers were sent a catalog and an order form from Far Eastern Trading Company or from a similar organization. All of these materials, including the child pornography, were prepared by the government at Project Looking Glass headquarters in Newark, New Jersey. If the target responded to this solicitation and ordered material from Far Eastern Trading Company, the Newark office was informed and sent

---

1. The parties' briefs sometimes refer to the program as "Operation Looking Glass." The district court made no detailed findings of fact concerning the nature and activities of Project Looking Glass. We obtained our description of Project Looking Glass from the June 1987 affidavit of United States Postal Inspector Joseph L. Schouten and from the court's discussion of Project Looking Glass in *United States v. Goodwin*, 674 F.Supp. 1211 (E.D.Va.1987), *aff'd*, 854 F.2d 33 (4th Cir.1988). Although the government indicates in its brief that this sting operation commenced in "early 1987", our examination of other cases shows that it was operating at least as early as 1985, *see United States v. Esch*, 832 F.2d 531, 533 (10th Cir.1987) (postal inspection service established Love Land in 1985).

2. The United States Custom Service conducts a similar sting operation labeled "Operation Borderline." *United States v. Musslyn*, 865 F.2d 945, 946 (8th Cir.1989).

3. The names of the organizations in addition to Love Land appear in the court's discussion in *Musslyn*, 865 F.2d 945.

4. At oral argument, the government took the position that "anyone who was not a pedophile ... [would] simply throw the questionnaire away" without answering it. We do not follow the government's logic since the questionnaire seems designed to attract the interest of individuals possessing one or more of a broad range of legal sexual and non-sexual interests.

the child pornography to the Project Looking Glass official nearest the target. The official then placed the material in an envelope with a St. Croix stamp and caused the Postal Service to deliver the material to the target.

James Mitchell's name was one of many thousand on the list of those whom the government thought made promising targets. One of the principal sources of these names was the mailing list of Catherine Stubblefield Wilson whose records were seized pursuant to her arrests in 1976 and 1982. The records that the government seized from Wilson indicated that Mitchell had ordered "Skoleborn School Children," an illicit Swedish child pornography magazine.[5] Mitchell was one of the thousands whom the government tested through the Love Land questionnaire. He was one of the more than 1,400 whom the government thought should be solicited because of their responses to the Love Land questionnaire and he was one of the more than 200 arrested when they accepted the solicitation by the Far Eastern Trading Company.

## DISCUSSION

### I. *General Principles*

The sexual abuse of minors is a reprehensible crime. It has led Congress and the states to enact statutes that punish severely those who subject minors to sexual exploitation and also those whose activities may encourage or reward these acts of sexual exploitation. The Supreme Court has held that such statutes do not violate the Constitution. *Osborne v. Ohio,* —— U.S. ——, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

This does not mean, however, that the government's methods of enforcing these statutes are insulated from judicial review.

■ We must be especially vigilant in our review when the methods chosen by the government to investigate and prosecute the proscribed behavior have the potential to interfere with or chill the exercise of constitutional rights. *See, e.g., Presbyterian Church v. United States,* 870 F.2d 518 (9th Cir.1989) (Constitutional injury occurs when INS' covert surveillance of worship services in order to investigate possible violations of immigration laws chills participation in services.). The fact that the subject matter (child pornography) is illegal does not insulate government conduct from scrutiny for outrageousness.[6] *See, e.g., Greene v. United States,* 454 F.2d 783 (9th Cir.1971) (bootleg whiskey); *United States v. Bogart,* 783 F.2d 1428 (9th Cir.), *vacated on other grounds sub. nom. United States v. Wingender,* 790 F.2d 802 (1986) (cocaine).

### II. *Outrageous Government Conduct*

■ It is well established that government agents may approach, investigate and entice individuals already engaged in or contemplating criminal activity. *See, e.g., United States v. Emmert,* 829 F.2d 805, 812 (9th Cir.1987); *United States v. O'Conner,* 737 F.2d 814, 817–18 (9th Cir.1984), *cert. denied,* 469 U.S. 1218, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985). The extent of the government's participation is not, however, unlimited. Where undercover agents or informers engineer and direct the criminal enterprise from start to finish, due process prevents the conviction of even a predis-

**5.** According to the government, Wilson used an extensive mailing list, totalling many thousands of names, to control about eighty percent of the United States market for child pornography. According to Postal Inspector William Anderson, the market for mail order child pornography "virtually dried up overnight" after her 1982 arrest and her mailing list, consisting of many thousands of names and addresses, was distributed to postal inspectors nationwide. Los Angeles Times, July 24, 1984, § I(H), at 2, col. 4. The Wilson list forms a portion of the list of targets held by Postal Inspector K.A. Elsessner,

a Project Looking Glass member. Schouten affidavit, June 1987.

**6.** Even the compelling societal interest of protecting minors from sexual abuse must yield to specific constitutional guarantees. *See Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (holding that placement of a screen between child sexual abuse victims and defendant during victims' testimony violates defendant's sixth amendment right even though the screen was intended to protect the victims from trauma).

posed defendant. *United States v. Citro,* 842 F.2d 1149, 1153 (9th Cir.1988). In such circumstances, the conduct of the government is considered "so shocking and so outrageous as to violate the universal sense of justice." *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983) (quoting *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977)).

For example, in *Greene v. United States,* 454 F.2d 783 (9th Cir.1971), the government helped to reestablish and maintain a criminal bootlegging operation, supplied the essential equipment and ingredients, and was the only customer for the illicit liquor produced. The court vacated the convictions because it did not think that "the government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations and yet prosecute its collaborators." *Id.* at 787. In so holding, the court relied on a number of circumstances "which, *in combination,* require reversal of [the] convictions." *Id.* at 786 (emphasis added).

■ The *Greene* court was particularly influenced by the pressure applied by government agents to "prod" the appellants into the production of bootleg alcohol. The court was struck by a statement made by the undercover agent to appellants [7] which, the panel concluded, "could only be construed as a 'veiled threat'" in the context of criminal "syndicate" operations. *Id.* at 787. In the instant case, by contrast, there is no evidence that Mitchell was threatened or coerced by government agent into buying child pornography. On the

contrary, he responded to the solicitation voluntarily without any governmental prodding. Moreover, he had previously ordered an illicit child pornography magazine, and the government targeted him on that basis.

Rather than *Greene,* the facts of this case are more similar to those of *Shaw v. Winters,* 796 F.2d 1124 (9th Cir.1986). In *Shaw,* a San Jose, California police officer sold allegedly stolen food stamps to the defendant at a discount as part of an undercover operation aimed at dealers in stolen property. As in the instant case, the government agent in *Shaw* orchestrated the operation: he offered the stamps, arranged the sales, and offered tips on how to pass the stamps. However, in both cases, the appellant purchased the contraband willingly and without pressure. In such circumstances, claims of a violation of due process will not lie since the participation of government officials is not so pervasive as to violate notions of "fundamental fairness." *Id.* at 1125 (citing *United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)).[8]

## CONCLUSION

We find that the apprehension of appellant for knowingly receiving child pornography through a government sting operation known as Project Looking Glass did not constitute outrageous government conduct.

AFFIRMED.

---

7. The agent told appellants "The boss is on my back."

8. The investigation in the case at bar illustrates why there is a need for some due process limits on undercover operations. Thousands of persons answered the Love Land questionnaire, yet only 1400 gave answers that triggered further solicition. The thousands who did not give such answers nonetheless unknowingly disclosed their sexual attitudes and proclivities to the government and were deceptively led to tell the government such intensely private informa-

tion as the age when they had their first sexual experience. That the government, in persuading persons to answer the questionnaire, cynically invoked the rhetoric of the first amendment, is particularly offensive.

Mitchell does not have standing to raise the rights of other persons whose rights may have been violated in the course of this investigation. *United States v. Valdovinos–Valdovinos,* 743 F.2d 1436, 1437 (9th Cir.1984). We therefore have addressed only whether the government's conduct was outragious as to *him.*