USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-1645 UNITED STATES OF AMERICA, Appellee, v. WILLIAM L. GIFFORD, Defendant, Appellant. _________________________ ERRATA SHEET ERRATA SHEET The order of the court issued on February 24, 1994 is corrected as follows: 1. On page 23, 2d line of runover paragraph, replace "constitutionally adequate" with "paragraph-wide" 2. On page 23, 1st full paragraph, change the second line to read as follows " . . . Video holding, we respectfully decline _____ to follow the panel's determination that the Constitution demands that a defendant must have had actual knowledge of the minority of at least one of the performers. We hold instead that the appropriate constitutional requirement is one of recklessness, that section 2252 satisfies it, and that, therefore, the statute's scienter requirement is constitutionally adequate. The statute's legislative history makes it pellucid . . . . " 3. On page 23, 1st full paragraph, line 11, strike "Furthermore, the" and replace with "This". UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 93-1645 UNITED STATES OF AMERICA, Appellee, v. WILLIAM L. GIFFORD, Defendant, Appellant. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ _________________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ _________________________ Annemarie Hassett, Federal Defender Office, on brief for __________________ appellant. Jeanne M. Kempthorne, Assistant United States Attorney, with ____________________ whom A. John Pappalardo, United States Attorney, was on brief, __________________ for the United States. _________________________ February 24, 1994 _________________________ SELYA, Circuit Judge. A jury convicted defendant- SELYA, Circuit Judge. ______________ appellant William L. Gifford on a charge of illicit receipt of child pornography in violation of 18 U.S.C. 2252(a)(2) (1988).1 The district court imposed an 18-month incarcerative sentence. Gifford appeals both the conviction and the sentence. Appellant's principal argument requires us to probe the dimensions of the entrapment doctrine in the aftermath of Jacobson v. United States, 112 S. Ct. 1535 (1992). When all is ________ _____________ said and done, we find ourselves unpersuaded either by appellant's argument on entrapment or by his other merits-related asseverations. Consequently, we affirm the conviction. Appellant's sentence presents a different set of considerations. On this scumbled record, we conclude that the course of prudence is to vacate the sentence and remand for resentencing in light of our recent decision in United States v. Rivera, 994 F.2d 942 (1st _____________ ______ Cir. 1993). I. BACKGROUND I. BACKGROUND This appeal finds its genesis in an undercover investigation mounted by a postal inspector, John Dunn, who, using the alias of "Gatewood," sent a letter to appellant in February of 1986 (after culling his name from the mailing list of a company reputed to distribute child pornography). Gatewood ____________________ 1The statute of conviction makes it a federal crime for a person "knowingly" to receive "any visual depiction that has been mailed . . . if (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (B) such visual depiction is of such conduct." 18 U.S.C. 2252(a)(2). Visual depictions of this genre are commonly referred to as child pornography. 3 wrote that, while abroad, he had "developed what others might consider forbidden interests." He claimed that his "publisher friends" had given him "a few Stateside addresses," presumably including appellant's, and asked if appellant had an interest in pursuing the matter. Appellant responded promptly, specifying a post office box as his return address. His letter stated: "I don't know who you are, but would like to know anyway. Please let me know who you are (Mr. or Mrs.) and what you would like to correspond about. Let me hear from you, as I don't know anything about your given address!" Gatewood replied to this letter in June,2 writing that he had a "very strong appreciation of a varied sexual life," a "love for the much younger generation," and a "decent collection" of films ____________________ 2The full text of Gatewood's letter follows: Sorry for the delayed response. I still do travel quite a bit and organization of my personal life is not my strongest suit. I just misplaced you for a while. I've had several close friends over the years into Scandinavian publishing and photography. I thus have acquired a very decent collection of materials that others not so inclined might find confusing. I have a very strong appreciation of a varied sexual life. Spending some time on Uncle Sam in the Far East fully developed my love for the much younger generation. I hope I've been properly led. I do have a few close friends stateside with whom I trade/loan. Not much into selling but we could talk. Hope to hear from you William. Let me know what you like. Feels strange writing to a PO Box but I'll give you the benefit of the doubt. 4 and photographs. He remarked that he had a group of friends with whom he exchanged such baubles. Appellant answered this missive in early July, inquiring about "Scandinavian publishing material" that might be available for purchase. Gatewood did not reply.3 The next contact between appellant and the postal inspectors consisted of a single-page advertisement disseminated by the Far Eastern Trading Co. (Fetco), a sham corporation. The bogus solicitation criticized the government's efforts to censor "children's pornography," indicated that Fetco had devised a foolproof technique for shipping such materials into the country undetected, and invited responses from interested parties. Appellant signed and returned the printed form provided for that purpose, enclosing a note in which he referred to a specific publisher, COQ.4 He also requested catalogs for "this type of material" and a listing of similarly oriented Scandinavian publishers. Fetco then sent appellant a catalog that described a variety of films in a crude way that left little to the imagination and left no shred of doubt that the films constituted visual depictions of the kind targeted by 18 U.S.C. 2252(a)(2).5 By letter postmarked January 26, 1987, appellant ____________________ 3Inspector Dunn testified at trial that the government's undercover operation generated so overwhelming a response as to overtax its capabilities. 4According to the testimony at trial, COQ functioned as a prominent source of child pornography in the 1980s. 5To cite two representative offerings, the catalog mentioned "Preteen Trio," described as a "Lolita movie of real action" featuring a girl of 9 and boys of 12 and 15 having intercourse, and a film entitled "Children Sex Orgy." 5 ordered two items, "Dolls" and "Pissing Lolita," and requested thatFetcoinform himwhenthemagazine"EroticYouth" wouldbeavailable. The government neither filled appellant's order nor cashed his check. In June of 1987, appellant bemoaned the delay and requested immediate clarification of the status of his order. The government temporized, sending appellant a new catalog. On July 31, 1987, appellant forwarded a replacement order and another check. He again requisitioned "Pissing Lolita," but in lieu of "Dolls," he substituted two magazines, "Baby Love" and "Lolita Sex."6 This order, too, went unrequited. In the spring of 1988 the government initiated another contact. It sent appellant a complimentary copy of "Tender Moments," a newsletter published by postal inspectors under the ____________________ 6All three items purported to contain child pornography. To illustrate the unambiguous nature of the solicitation, we quote, albeit reluctantly, from the catalog. It supplied the following blurb for "Pissing Lolita": This is an absolute sensation! A film which shows you the ultimate pleasure children and adults have in the act of pissing over each other. They try mostly to hit the little cunts. Look at the two Lolitas of nine and ten enjoying it. And see these girls pissing! The catalog described "Baby Love" as: Youngest of the young. Young darling girl 2 1/2 years old learns masturbation from her mother. Great shots of wide open lips. The catalog described "Lolita Sex" as: More pissing and masturbation from the producers of the Lolita series of magazines. Girls 8 years up to 15 years in hard core action. Exciting intercourse and cum shots. 6 pseudonym of "the American Sensuality Society." The Society purported to be a club whose members, for a fee, could place advertisements and notices in the newsletter. In July, appellant completed a membership form, sent a check, and wrote a note indicating an interest in purchasing copies of the "Bambina sex series" and "Lolita-sex magazines." One month later, appellant placed an advertisement in "Tender Moments" requesting, inter _____ alia, addresses of Danish bookstores offering adult material. ____ Using the name Christian M., and conjuring up a fictitious association with a fictitious firm, "Chrismere Associates," the ubiquitous Inspector Dunn responded to this note in June of 1989, asking that appellant "[l]et me know exactly the sort of action desired and preferred ages . . . ." When appellant replied that his interest lay in "films or magazines of teen or pre-teen girls or boys in the nudist or other state of nakedness," Christian wrote back: "If you are seeking nudist or naturist type things I cannot be much assistance as my collection of material is what is called here ACTION that is oral and penetrating and features preteen girls nine to eleven." Appellant rose to the bait, acknowledging that he was "interested in a loan of Lolita or other pre-teen magazines to my mailbox, which is safe and private . . . ." Though communications continued for some time, no materials were shipped. During the tail end of these negotiations, yet another government undercover operation surfaced. This operation, called "Canamerican," forwarded appellant a brochure on March 1, 1990. 7 The brochure featured child pornography.7 Appellant expressed pleasure at "hear[ing] of what you have to offer" and communicated an interest in purchasing "copies of . . . 8 mm films" and "teen or pre-teen magazines." On June 3, 1990, appellant placed an order, requesting that Canamerican "[s]end the films `Lolita Children Love' and `PreTeen Trio' for now," along with "photocopies of Bambina Sex 4-5." In August, appellant inquired about the status of his order. Having one's fondest wishes come true can sometimes prove to be a curse. On September 22, 1990, the materials arrived at appellant's post office box in Woburn, Massachusetts. Appellant collected them from the box. Government agents then arrested him. At the time of his arrest, appellant acknowledged that he knew the package mailed by Canamerican would contain visual depictions of under-age females engaged in sexually explicit conduct. The authorities later obtained a search warrant for appellant's apartment. On executing the warrant, they found various notes, including one that read: wrote on 10/15 Scandinavian Connection Copenhagen Denmark Amsterdam Netherlands * * * Blondie, Bambina Sex, Lolita, ____________________ 7The films offered for sale in the brochure included "Pre- Teen Lolita Mix," which was described as featuring a 9-year-old girl having intercourse, and other motion pictures described as depicting girls 9-13 and boys 7-14 having sexual relations. 8 Baby Love Moppets, Incest #5, Schoolgirls. Trial testimony identified "Scandinavian Connection" as a well- known purveyor of child pornography during the late 1970s and early 1980s. It was not a government front. "Blondie," "Moppets," and "Incest #5" are titles of films that never appeared in catalogs or other offering materials that the government furnished to appellant. II. THE ENTRAPMENT DEFENSE II. THE ENTRAPMENT DEFENSE Appellant's principal contention in this court, as below, is that he was entrapped and, accordingly, that the district court should have granted his motion for judgment of acquittal under Fed. R. Crim. P. 29. We are not persuaded. A. Standard of Review. A. Standard of Review. __________________ The standard of review is not controversial. "Following a guilty verdict, a reviewing court must scrutinize the record, eschewing credibility judgments and drawing all reasonable inferences in favor of the verdict, to ascertain if a rational jury could have found that the government proved each element of the crime beyond a reasonable doubt." United States _____________ v. Sepulveda, ___ F.3d ___, ___ (1st Cir. Dec. 20, 1993) [No. 92- _________ 1362, slip op. at 7]. Moreover, "[t]o sustain a conviction, the court need not conclude that only a guilty verdict appropriately could be reached; it is enough that the finding of guilt draws its essence from a plausible reading of the record." Id. And, ___ finally, our cases are consentient that the prosecution's burden of proof may be satisfied by either direct or circumstantial 9 evidence, or by any combination thereof. See United States v. ___ ______________ Echeverri, 982 F.2d 675, 677 (1st Cir. 1993); United States v. _________ ______________ Victoria-Peguero, 920 F.2d 77, 86-87 (1st Cir. 1990), cert. ________________ _____ denied, 111 S. Ct. 2053 (1991). So long as the evidence, taken ______ as a whole, supports the judgment of conviction, it need not rule out other hypotheses more congenial to a finding of innocence. See Victoria-Peguero, 920 F.2d at 86-87. ___ ________________ Appellant's entrapment defense must be analyzed within this framework, but with special attention to the shifting burdens of production indigenous to entrapment. See, e.g., ___ ____ United States v. Rodriguez, 858 F.2d 809, 812-13 (1st Cir. 1988). _____________ _________ Our cases make clear that, as with most affirmative defenses, a judge can instruct a jury concerning entrapment only if the defendant has carried the "entry-level burden" of showing that "the record, viewed most charitably to the proponent of the instruction, furnishes an arguable basis" for an assertion of the defense. Id. at 813; accord United States v. McKenna, 889 F.2d ___ ______ _____________ _______ 1168, 1174 (1st Cir. 1989). While the necessary level of evidence is not "so substantial to require, if uncontroverted, a directed verdict of acquittal . . . it must be more than a mere scintilla." United States v. Pratt, 913 F.2d 982, 988 (1st Cir. _____________ _____ 1990) (citations omitted), cert. denied, 498 U.S. 1028 (1991). _____ ______ It is only when and if a defendant successfully carries this entry-level burden that the entrapment defense secures a foothold in the case. Once that occurs, the government must shoulder the burden of proving, beyond reasonable doubt, the absence of 10 entrapment. See Rodriguez, 858 F.2d at 815; United States v. ___ _________ ______________ Polito, 856 F.2d 414, 416 (1st Cir. 1988). ______ B. Analysis. B. Analysis. ________ The crux of this issue is the supportability of the jury's finding that the government did not entrap appellant.8 Appellant's arguments on this score require us to revisit our entrapment jurisprudence in light of the Court's opinion in Jacobson, 112 S. Ct. 1535. Having made this pilgrimage, we ________ conclude that Jacobson has brought into slightly better focus, ________ but not supplanted, one bearing wall within the existing structure of our entrapment jurisprudence. In the end, we find that the court below committed no reversible error and that the record contains ample evidence to sustain the jury's verdict. The affirmative defense of entrapment is comprised of two elements: "(1) government inducement of the accused to engage in criminal conduct, and (2) the accused's lack of predisposition to engage in such conduct." Rodriguez, 858 F.2d _________ at 812; accord Polito, 856 F.2d at 415-16. Jacobson does not ______ ______ ________ alter this structure, but only clarifies the second component. It teaches that when entrapment is genuinely in issue meaning that the defendant has met his entry-level burden, see supra Part ___ _____ II(A) "the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to ____________________ 8Because we choose to meet appellant's sufficiency challenge head-on, we do not reach the government's related claim that appellant failed to carry his entry-level burden, see Rodriguez, ___ _________ 858 F.2d at 812, and, therefore, forfeited the right to assert the entrapment defense at all. 11 first being approached by government agents." Jacobson, 112 S. ________ Ct. at 1540. Seizing on this directive, appellant contends that the government improperly induced him to purchase the mailed materials and, in all events, that a reasonable jury could not have found him, in his primeval state, to have been predisposed. We examine these contentions separately. 1. Inducement. The first question is whether the 1. Inducement. __________ government's actions constituted an unlawful inducement to engage in criminal conduct.9 We start our perlustration of this issue with first principles. Neither mere solicitation nor the creation of opportunities to commit an offense comprises inducement as that term is used in entrapment jurisprudence. See ___ Pratt, 913 F.2d at 989; United States v. Coady, 809 F.2d 119, 122 _____ _____________ _____ (1st Cir. 1987). Rather, inducement refers to government conduct that persuades a person to turn "from a righteous path to an iniquitous one." Coady, 809 F.2d at 122. Inducement can be _____ found only when the government has ventured beyond a simple offer, say, by pleading with a defendant, see, e.g., Pratt, 913 ___ ____ _____ F.2d at 988; Kadis v. United States, 373 F.2d 370, 374 (1st Cir. _____ _____________ 1967), or by using inherently coercive tactics (e.g., threats or ____ promises of reward), see, e.g., United States v. Stanton, 973 ___ ____ ______________ _______ F.2d 608, 610 (8th Cir. 1992), or by arm-twisting based on need, sympathy, friendship, or the like, see Sherman v. United States, ___ _______ _____________ 356 U.S. 369, 376 (1958); United States v. Campbell, 874 F.2d _____________ ________ ____________________ 9Jacobson has no bearing on the issue of inducement because, ________ in that case, the Court had no occasion to deal with inducement. See Jacobson, 112 S. Ct. at 1540 n.2. ___ ________ 12 838, 843-44 (1st Cir. 1989); United States v. Kelly, 748 F.2d _____________ _____ 691, 698 n.16 (D.C. Cir. 1984). Under these guidelines, the evidence comfortably supports a conclusion that the postal inspectors' actions in this case did not constitute unlawful inducement to commit the crime. We think that a reasonable jury easily could have found that the government's overtures to appellant, though prolonged, amounted to no more than open-ended solicitations, all of which, at least implicitly, invited uninterested recipients to pay no heed. The postal inspectors made no appeal to the "sympathy of an obviously reluctant person." Kadis, 373 F.2d at 373. The opposite seems _____ true: the solicitations were unsophisticated, erratic in their timing, and not designed to exert pressure of any sort. By like token, the solicitations held out no promise of tempting rewards (apart from whatever satisfaction could be derived from the erotica itself). Just the reverse: appellant was required to pay in advance to join the American Sensuality Society and to obtain any material that he deigned to order. In itself, this conclusion disposes of appellant's sufficiency-of-the-evidence challenge, for, as a matter of law, entrapment cannot flourish unless both elements of the defense inducement and an absence of predisposition coincide.10 ____________________ 10For this reason, the government is correct in its assertion that the jury charge was flawed. The district court instructed the jury that "if the evidence in the case leaves you with a reasonable doubt whether Mr. Gifford was willing to commit the crime, apart from the persuasion of government agents, then, you must find him not guilty." The court thus neglected to tell the jury that, in order to acquit on the basis of entrapment, it 13 "[T]he defense fails if the jury is persuaded beyond a reasonable doubt that either is lacking." Rodriguez, 858 F.2d at 815. ______ _________ 2. Lack of Predisposition. For the sake of 2. Lack of Predisposition. ________________________ completeness, we note that the evidence also supports a finding that appellant, dating back to the beginning of 1986, did not lack predisposition to traffick in child pornography. Jacobson ________ gives us guidance as to what evidence suffices to show a predilection to violate the law at the critical time, that is, in advance of the government's initial intervention. The Court's opinion does not require the government to furnish direct evidence that a defendant had been violating (or, at least, trying to violate) the law prior to the government's intercession. Rather, under Jacobson, ready commission of the ________ criminal act can itself adequately evince an individual's predisposition. See Jacobson, 112 S. Ct. at 1541. ___ ________ Of course, the fly in the ointment here is that, in a purely temporal sense, ready commission of the criminal act did not transpire; the postal inspectors first contacted appellant in early 1986, yet appellant did not place the order that led to his arrest until mid-1990. The fifty-two months that elapsed is a considerably longer span of time than the "26 months of repeated mailings and communications from Government agents and fictitious organizations" that marked Jacobson's dalliance with the ____________________ also would have to discern a reasonable doubt as to predisposition. In the circumstances at bar, however, the error, which tilted in appellant's favor, is of no consequence. See ___ Cook v. Rhode Island Dep't of Mental Health, Etc., 10 F.3d 17, ____ ___________________________________________ 23-24 (1st Cir. 1993). 14 authorities. Id. Yet, the two situations are far different from ___ a qualitative standpoint. And on the facts of this case, we believe that a jury reasonably could conclude that appellant, unlike Jacobson, was predisposed to commit the crime from the inception. Just as "ready commission" of a crime can "amply demonstrate[] the defendant's predisposition," id., so, too, ___ demonstrated readiness to commit a potential crime can suffice to prove predisposition. We discount the initial mailing as too cryptic to be meaningful. Starting with Gatewood's second letter, however, appellant's reaction to the postal inspectors' overtures exhibited considerable enthusiasm. And when the government, by forwarding the Fetco catalog, first presented appellant with a concrete opportunity to purchase child pornography less than one year after its initial contact he promptly wrote out a check and placed an order for two items. Seven months later, when his first order had not borne fruit, appellant placed a second order for illicit materials. Although these orders, through no fault of appellant's, went unfilled, a rational jury nonetheless could have found that appellant's placement of the orders manifested the required predisposition to commit the crime. We do not see how the government's failure to fill these earlier orders, thereby thwarting appellant's successful completion of the crime, could serve to undercut the inference of readiness that appellant's conduct conveyed. Moreover, such an inference is strengthened here by 15 other circumstantial proof. For one thing, the jury had before it the evidence of appellant's subsequent expressions of interest in purchasing child pornography. For another thing, the jury had the evidence uncovered during the search of appellant's apartment evidence from which a rational finder of facts might conclude that appellant dealt with a commercial distributor of child pornography wholly independent of the federal government. For a third thing, appellant's references over time to matters not mentioned by the government, such as "Danish bookstores," lent credence to the inference of predisposition. Hence, Jacobson ________ notwithstanding, the district court appropriately submitted the issue of entrapment to the jury. We think that there is also a second, more fundamental distinction between Jacobson and the case at hand: the Jacobson ________ ________ Court's core concern simply is not vellicated by the facts of record here. In Jacobson, the Court questioned whether the ________ defendant's predisposition arose independently, rather than as the product of governmental efforts. See Jacobson, 112 S. Ct. at ___ ________ 1541. The Court's concern derived from the fact that nearly all the material furnished by the government purported to originate with consumer research companies or lobbying organizations that promoted sexual freedom and freedom of speech, and that urged purchase of their materials, which were not clearly child pornography, as a means of raising funds for their political mission. See id. at 1542. Before and during the relevant time ___ ___ frame, Jacobson had expressed solidarity with these political 16 goals, but he had not indicated in any way that he wished to receive child pornography. On these facts, the Court feared that "by waving the banner of individual rights and disparaging the legitimacy and constitutionality of efforts to restrict the availability of sexually explicit materials, the Government . . . exerted substantial pressure on petitioner to obtain and read such material as part of a fight against censorship and the infringement of individual rights." Id. ___ By contrast, no such high-minded appeals characterize the instant case. Here, unlike in Jacobson, the jury reasonably ________ could have found that defendant eagerly responded to each and every solicitation in a manner indicating his immediate interest in receiving forbidden materials. Here, unlike in Jacobson, the ________ government-sponsored overtures for the most part did not purport to come from political organizations, but from private collectors and commercial distributors.11 And, finally, here, unlike in Jacobson, the material promoted by the mailings was easily ________ recognizable as containing child pornography. In short, a jury reasonably could have concluded that this was not, as appellant would have it, Jacobson redux. That is to say, the jury ________ reasonably could have thought that this was not a case in which government agents "implant[ed] in the mind of an innocent person ____________________ 11To be sure, the one-page solicitation originally sent by Fetco did express a political opinion in the sense that it criticized "censor[ship]" of pornography. But, unlike in Jacobson, 112 S. Ct. at 1542, the Fetco circular did not claim ________ that sales proceeds would fund lobbying activities or be used for some equally ennobling purpose. 17 the disposition to commit the alleged offense and induce[d] its ___________ commission in order that they may prosecute." Id. at 1543 ___ (citation omitted).12 III. OTHER CHALLENGES TO THE CONVICTION III. OTHER CHALLENGES TO THE CONVICTION Appellant stages two other offensives in his campaign to overcome the jury verdict. Neither offensive gains him any ground. A. Outrageous Misconduct. A. Outrageous Misconduct. _____________________ Appellant asserts that the prolonged series of undercover operations mounted by the postal inspectors constituted misconduct so fundamentally unfair as to violate the due process clause of the Fifth Amendment. In terms, this assertion bears a family resemblance to appellant's assault on the failure of the judge and jury to find entrapment. It fares no better. Government agents run awry of the due process clause if, and to the extent that, their investigative conduct violates "fundamental fairness" and is "shocking to the universal sense of ____________________ 12We do not believe that the Jacobson Court intended to ________ hamstring routine undercover operations of the kind that Gifford encountered. The Court took pains to observe that if the government agents had "simply offered petitioner the opportunity to order child pornography through the mails, and petitioner . . . had promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction." Jacobson, 112 S. Ct. at 1541. The Court's ________ comment applies a fortiori in the instant case, especially since _ ________ the issue here is not whether the factual panoply warranted submission of the entrapment defense to the jury as a theoretical possibility, but whether, after the judge instructed the jury on entrapment and the jury rejected the defense on the facts, its verdict should be overturned because entrapment suffused the scene as a matter of law. 18 justice." United States v. Russell, 411 U.S. 423, 432 (1973). _____________ _______ We recently stated that, in theory, "the government's active participation in a criminal venture may be of so shocking a nature as to violate a defendant's right to due process, notwithstanding a defendant's predisposition to commit the crime." United States v. Panitz, 907 F.2d 1267, 1272 (1st Cir. ______________ ______ 1990) (citations omitted). Yet, we cautioned in virtually the same breath that this court had never encountered a situation where that sort of government involvement "crossed the constitutional line." Id. The case before us does not break the ___ string. We do not see a need for exegetic comment. Despite the fact that undercover operations by their nature involve elements of furtiveness, duplicity, and manipulation, we have never held that such initiatives are per se unfair. To the contrary, we ___ __ think that the Executive Branch is free, within broad limits, to set such snares for unwary criminals. See United States v. ___ _____________ Santana, 6 F.3d 1, 5-6 (1st Cir. 1993); United States v. Connell, _______ _____________ _______ 960 F.2d 191, 194, 196 (1st Cir. 1992); see also United States v. ___ ____ _____________ Mitchell, 915 F.2d 521, 526 (9th Cir. 1990) (upholding reverse ________ sting operation in child pornography case), cert. denied, 111 S. _____ ______ Ct. 1686 (1991). In this connection, it is important to understand that the fairness of employing a particular form of undercover operation is in part a function of the crime under investigation. See United States v. Osborne, 935 F.2d 32, 37 ___ ______________ _______ (4th Cir. 1991); see also Santana, 6 F.3d at 7 (outlining ___ ____ _______ 19 considerations relevant to assessing the outrageousness vel non ___ ___ of an undercover officer's conduct in a "reverse sting" operation). We cannot say that, here, the postal inspectors lacked a rational basis for mounting a long-running series of undercover operations in an effort to curb unlawful trafficking in child pornography.13 See Osborne, 935 F.2d at 37 (concluding that ___ _______ "undercover operations provide a [lawful] means by which participants in the clandestine child pornography industry can be detected"). And, moreover, fundamental fairness is not compromised in a child pornography case merely because the government supplies the contraband. See, e.g., Mitchell, 915 ___ ____ ________ F.2d at 526; United States v. Musslyn, 865 F.2d 945, 947 (8th _____________ _______ Cir. 1989), cert. denied, 114 S. Ct. 443 (1993); United States v. _____ ______ _____________ Driscoll, 852 F.2d 84, 86 (3d Cir. 1988); cf. Santana, 6 F.3d at ________ ___ _______ 8 (holding that DEA's actions in supplying a large amount of heroin to suspected drug dealers did not warrant dismissal). In this instance, the government's strategy seems fairly calculated to combat the spread of child pornography by putting consumers of forbidden depictions at warranted risk. The postal inspectors' communiques do not strike us as possessing the ____________________ 13In the proceedings below, the district court suggested that due process requires that the government must always harbor a reasonable suspicion of criminal wrongdoing before targeting an individual for testing in the crucible of an undercover investigation. We reject this idea. See United States v. ___ _____________ Espinal, 757 F.2d 423, 426 (1st Cir. 1985) (finding undercover _______ operation to be lawful vis-a-vis a defendant as to whom the government had no previous suspicion of criminal activity). 20 capacity to overbear a guileless recipient's will. They were, instead, neutral tests designed to assay a recipient's willingness to order contraband. In the same vein, the government's promotional literature, read as a whole, was not unfairly deceptive; although the Fetco brochure indicated on its face that the goods offered for sale did not contain child pornography, it was within the jury's province to conclude that appellant must have realized from the circular's contents that this was an apocryphal disclaimer. Nor does the temporal span of the government's undercover operation make it vulnerable to appellant's attack. Although the sting ultimately stretched over four years, appellant placed a mail order for illicit materials within a year after first being contacted by the postal inspectors. The government's decision to continue its investigation of appellant under such circumstances is far removed from outrageous conduct. See, e.g., Musslyn, 865 F.2d at ___ ____ _______ 946 (upholding undercover sting operation that lasted nearly five years); United States v. Goodwin, 854 F.2d 33, 35-36 (4th Cir. ______________ _______ 1988) (similar; operation lasted nearly four years). In a nutshell, nothing in this record distinguishes the government's actions in any material respect from the numerous sting operations that we, and other courts, have upheld in case after case after case. See Santana, 6 F.3d at 4 (collecting ___ _______ cases); United States v. Moore, 916 F.2d 1131, 1139 (6th Cir. _____________ _____ 1990); Panitz, 907 F.2d at 1272-73 (collecting cases); United ______ ______ States v. Thoma, 726 F.2d 1191, 1199 (7th Cir.), cert. denied, ______ _____ _____ ______ 21 467 U.S. 1228 (1984). There is no point in retracing footsteps that have beaten a well-marked path. The district court did not err in rejecting appellant's claim of outrageous governmental misconduct. B. Constitutionality of the Statute. B. Constitutionality of the Statute. ________________________________ Appellant next asserts that the statute of conviction, 18 U.S.C. 2252(a)(2), quoted supra note 1, is unconstitutional _____ on its face. Because the issue presented poses an unadulterated question of law, appellate review is plenary. See Liberty Mut. ___ ____________ Ins. Co. v. Commercial Union Ins. Co., 978 F.2d 750, 757 (1st ________ __________________________ Cir. 1992); Stauble v. Warrob, Inc., 977 F.2d 690, 693 (1st Cir. _______ ____________ 1992). Appellant claims that section 2252(a) fails to pass constitutional muster because it does not require proof that the accused knew that the persons depicted in the described materials were under age. This claim is premised upon the holding in United States v. X-Citement Video, Inc., 982 F.2d 1285 (9th Cir. _____________ _______________________ 1992), petition for cert. filed (Nov. 5, 1993) (No. 93-723). The ________ ___ _____ _____ conclusion of the two-judge X-Citement Video majority rested on a ________________ single base, having two components. First, the court decided that the term "knowingly," as employed in section 2252(a)(2), modifies only the word "receives," and not the phrase "visual depiction[s] involv[ing] the use of a minor engaging in sexually explicit conduct"; and, second, the court decided that this syntax renders the statute constitutionally infirm because, by failing to predicate guilt on actual knowledge of the materials' 22 contents, particularly the age(s) of the persons depicted, the statute allows a person to be convicted without proof of the requisite scienter. See X-Citement Video, 982 F.2d at 1289-92; ___ _________________ see also Osborne v. Ohio, 495 U.S. 103, 112-15 (1990) (discussing ___ ____ _______ ____ constitutional requirement that prohibitions on child pornography include some element of scienter); see generally New York v. ___ _________ _________ Ferber, 458 U.S. 747, 765 (1982) (explaining that child ______ pornography statutes must contain "some element of scienter" to survive constitutional attack). The X-Citement Video opinion is something of a pariah. ________________ With regard to the first component of its holding, every other appellate court that has read section 2252(a) has determined that the provision imposes a scienter requirement vis-a-vis the contents of an interdicted mailing. See, e.g., United States v. ___ ____ _____________ LaChapelle, 969 F.2d 632, 638 (8th Cir. 1992); Osborne, 935 F.2d __________ _______ at 34 & n.2; United States v. Duncan, 896 F.2d 271, 277-78 (7th _____________ ______ Cir. 1990); United States v. Marchant, 803 F.2d 174, 176-77 (5th _____________ ________ Cir. 1986); United States v. Garot, 801 F.2d 1241, 1246-47 (10th _____________ _____ Cir. 1986). Indeed, we, ourselves, albeit in a civil case, advocated just such a construction of section 2252(a). See ___ Rodriguez v. Clark Color Lab., Inc., 921 F.2d 347, 349 (1st Cir. _________ ______________________ 1990). Though these opinions predate X-Citement Video, __________________ district courts outside the Ninth Circuit that have been asked to follow X-Citement Video uniformly have declined to do so. See, ________________ ___ e.g., United States v. Edwards, ___ F. Supp. ___, ___ (N.D. Ill. ____ _____________ _______ 23 1993) [1993 WL 453461, at *5] (declaring that notwithstanding X- __ Citement Video's contrary view, "the language of 2252 imposes a ______________ scienter element as to the nature of the proscribed visual depictions"); United States v. Prytz, 822 F. Supp. 311, 321 ______________ _____ (D.S.C. 1993) (noting that, though the X-Citement Video court's _________________ rendition "may be correct grammatically, it is not reasonable nor consistent with principles underlying constitutional interpretation of statutes and the courts' obligation to construe statutes to avoid unconstitutionality if possible"); United ______ States v. Long, 831 F. Supp. 582, 586 (W.D. Ky. 1993); United ______ ____ ______ States v. Kempton, 826 F. Supp. 386, 388-89 (D. Kan. 1993). No ______ _______ court has expressed support for the conclusion reached in X- __ Citement Video. ______________ We agree with the near-unanimous view, and with the relevant segment of Judge Kozinski's dissent in X-Citement Video, ________________ 982 F.2d at 1296-97. In our opinion, section 2252(a) incorporates a paragraph-wide scienter requirement. We read the term "knowingly," as used in the statute, to modify not only "receives" but also the entire paragraph, including age and conduct. Cf. United States v. Marvin, 687 F.2d 1221, 1226 (8th ___ ______________ ______ Cir. 1982) (interpreting "knowingly" in 7 U.S.C. 2024(b) as modifying the entire remainder of the clause in which it appears), cert. denied, 460 U.S. 1081 (1983). _____ ______ With regard to the second component of the X-Citement __________ Video holding, we respectfully decline to follow the panel's _____ determination that the Constitution demands that a defendant must 24 have had actual knowledge of the minority of at least one of the performers. We hold instead that the appropriate constitutional requirement is one of recklessness, that section 2252 satisfies it, and that, therefore, the statute's scienter requirement is constitutionally adequate. The statute's legislative history makes it pellucid that Congress intended to include a scienter requirement, and did not intend strict criminal liability. See ___ H.R. Rep. No. 910, 99th Cong., 2d Sess. 6 (1986), reprinted in _________ __ 1986 U.S.C.C.A.N. 5952, 5956 (discussing 1986 amendments to 2251, 2252, and explaining that "[t]he government must prove that the defendant knew the character of the visual depictions as depicting a minor engaging in sexually explicit conduct but need not prove that the defendant actually knew the person depicted was in fact under 18 years of age or that the depictions violated Federal law"). This statutory architecture passes constitutional scrutiny, for the Constitution does not require that an accused possess actual knowledge of the performers' ages. Rather, the scienter requirement imposed by section 2252(a) regarding the receipt of child pornography is satisfied if the prosecution can show reckless disregard of the obvious. See Osborne, 495 U.S. at ___ _______ 115 (holding that recklessness "plainly satisfies the requirement laid down in Ferber that prohibitions on child pornography ______ include some element of scienter"). To sum up, our determination that section 2252(a) survives appellant's constitutional challenge comports with the better-reasoned cases and, at the same time, honors the 25 prudential principle that, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, [courts should] construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." Edward J. DeBartolo Corp. v. Florida Gulf _________________________ ____________ Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575 (1988). ____________________________________ IV. THE SENTENCE IV. THE SENTENCE Appellant's final argument concerns his sentence. He claims that the lower court erred in not essaying a downward departure, see 18 U.S.C. 3553(b) (providing, inter alia, for ___ _____ ____ departures if the court ascertains "that there exists a[] . . . mitigating circumstance of any kind . . . not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a [sentence outside the guideline range]"); see also U.S.S.G. 5K2.0, which would have ___ ____ reduced his sentence below the guideline sentencing range (GSR). The government demurs. It maintains that we lack jurisdiction to consider this plaint, and, alternatively, that the district court justifiably refused to depart. In the peculiar circumstances of this case, these two propositions can be collapsed into a single issue. It is by now apodictic that a criminal defendant cannot ground an appeal on the sentencing court's discretionary decision not to depart below the GSR. See, e.g., United States v. ___ ____ _____________ Tardiff, 969 F.2d 1283, 1290 (1st Cir. 1992); United States v. _______ ______________ Amparo, 961 F.2d 288, 292 (1st Cir.), cert. denied, 113 S. Ct. ______ _____ ______ 26 224 (1992); United States v. Hilton, 946 F.2d 955, 957 (1st Cir. _____________ ______ 1991); United States v. Romolo, 937 F.2d 20, 22 (1st Cir. 1991). _____________ ______ This rule, like most rules, is subject to exceptions. One such exception applies when the sentencing court's declination to depart results from a mistake of law. See, e.g., Amparo, 961 ___ ____ ______ F.2d at 292; Hilton, 946 F.2d at 957. In other words, appellate ______ jurisdiction may attach if it appears that the failure to depart stemmed from the sentencing court's mistaken impression that it lacked the legal authority to deviate from the guideline range or, relatedly, from the court's misapprehension of the rules governing departures. In this instance, we think appellant's case fits within the exception. At sentencing, appellant moved for a downward departure on various grounds. He claimed that he suffered from an extraordinary mental and emotional condition within the purview of U.S.S.G. 5H1.3 and 5K2.13; that his offense conduct represented an isolated, aberrant act occurring against the backdrop of an otherwise exemplary lifestyle, which brought its commission within reach of U.S.S.G. 5K2.0 and Ch.1, Pt.A, intro. comment. 4(d); and that he would be especially vulnerable to abuse by other convicts if incarcerated. The district court rejected all three bases for departure, and sentenced appellant to eighteen months in prison (the low end of the GSR), but stayed the execution of sentence sua sponte. On appeal, Gifford ___ ______ abandons his vulnerability claim but stands fast by his other importunings. And he urges us to find, inter alia, that the _____ ____ 27 district court mistakenly believed itself to be bereft of legal authority to depart downward. While we express no opinion concerning the ultimate disposition of Gifford's case, a careful reading of the sentencing transcript persuades us that, at least as to a possible departure under section 5K2.0, appellant's argument has merit.14 In particular, we question whether the court below recognized the extent to which it was permitted to rely on its "judgment about whether the given circumstances, as seen from the district court's unique vantage point, are usual or unusual, ordinary or not ordinary, and to what extent." United States v. _____________ Rivera, 994 F.2d 942, 951 (1st Cir. 1993).15 ______ Under the sentencing statute, the relevant guidelines, and associated materials, a district judge is obligated to mete out a sentence within the GSR unless a permissible feature takes the case "outside the Guidelines' `heartland' and make[s] it a special, or unusual, case." Id. at 949; see also United States ___ ___ ____ _____________ ____________________ 14Because we remand for resentencing based on our analysis of section 5K2.0, we do not separately consider sections 5H1.3 and 5K2.13. We note, however, that to some extent the same factors underpin the several departure approaches in this case. And in all events, the district court is free, in its discretion, to revisit sections 5H1.3 and 5K2.13. 15We reach this conclusion without in any way faulting the district court. Our opinion in Rivera, a case that both refined ______ and elaborated earlier circuit precedent, did not emerge until some two weeks after Gifford had been sentenced. We expect a great deal from district judges, but we do not expect them to foretell the future with complete clairvoyance. See, e.g., ___ ____ United States v. Ladd, 885 F.2d 954, 961 (1st Cir. 1989) ______________ ____ (acknowledging that "robes and gavels are the tools of a jurist's trade not tea leaves or crystal balls"). 28 v. Aguilar-Pena, 887 F.2d 347, 349 (1st Cir. 1989) (explaining ____________ the "heartland" concept). As Rivera makes clear, there are only ______ nine "forbidden departures," that is, nine factors that are categorically ineligible to serve as the basis for a departure. See Rivera, 994 F.2d at 948-49 (listing race, sex, national ___ ______ origin, creed, religion, socioeconomic status, lack of youthful guidance, substance abuse, and personal financial difficulties). While all other factors can be taken into account in structuring the departure calculus, the architecture is complex. Those factors specifically enumerated in the guidelines reside in one category but we must subdivide that category into moieties: factors that are the stuff of encouraged departures, and factors that are discouraged, albeit not prohibited, as a basis for departure. See id. at 949. In a second category are ___ ___ "[c]ircumstances that may warrant departure from the guidelines . . . [but which] cannot, by their very nature, be comprehensively listed and analyzed in advance." U.S.S.G. 5K2.0, p.s. With respect to such unforeseen circumstances, the district court is to "decide whether to depart (and, if so, how much to depart) by examining the `unusual' nature of these circumstances and making a judgment about what is appropriate." Rivera, 994 F.2d at 949. ______ Of course, the district court did not indeed, it could not, see supra note 15 analyze this case in terms of the ___ _____ Rivera model. But the judge's comments at sentencing are ______ evocative of the misperception of hamstrung discretion that we sought to correct in Rivera, 994 F.2d at 953-54. The sentencing ______ 29 transcript makes it very clear that the judge viewed the circumstances of the case as unusual in certain important respects. The judge stated that, given appellant's psychological background [and] his inability to reason through from . . . cause to effect, . . . he did not as a matter of fact recognize the peculiarity of the sexual references in the Gatewood . . . correspondence; he did not comprehend as a matter of fact the socially unacceptable nature of the materials advertised in the Far Eastern Trading Company [and] Canamerican catalogs; he throughout believed that he was acting within the law, and indeed he believed from the nature of the government's sting operation that the materials advertised were legal for trade; and . . . he did assume that any of the advertisers who solicited him were operating legally through the mail. Based on these findings, the judge concluded that appellant "was a person entirely without mens rea" and that he was "unlike the normal person." To be sure, the judge, having made these findings, eschewed a downward departure. He stated that he feared departing because "[t]his case may be an example of the adage that hard cases make bad law." Yet, after Rivera, that bromide ______ sweeps less broadly in the world of guideline sentencing. Cf. ___ Rivera, 994 F.2d at 949 (observing that, in the final analysis, ______ "the Guidelines cannot dictate how courts should sentence in . . . special, unusual, or other-than-ordinary circumstances"). After Rivera, hard cases often make viable departure candidates. ______ Just as deciding whether to depart sometimes may present a difficult judgment call for a sentencing court, the evaluation of departure rulings frequently requires an appellate 30 court to walk a tightrope, ceding "full awareness of, and respect for" the trial court's "superior `feel' for the case," United ______ States v. Diaz-Villafane, 874 F.2d 43, 50 (1st Cir.), cert. ______ ______________ _____ denied, 493 U.S. 862 (1989), yet reviewing de novo, without ______ __ ____ deference to the trial court's outlook, the question of "whether or not the allegedly special circumstances . . . are of the `kind' that the Guidelines, in principle, permit the sentencing __ _________ court to consider at all," Rivera, 994 F.2d at 951. In this ______ case, we think that the two methodologies can peacefully coexist, for the circumstances identified by the district court might, as __________ __ ___ ________ _____ a matter of law, support a downward departure. See id. at 949 ___ ___ (noting that a district court's determination of what sentence is appropriate can be informed by the "`nature and circumstances of the offense,' the `history and characteristics of the defendant,' and the basic purposes of sentencing, namely, just punishment, deterrence, incapacitation and rehabilitation") (citations omitted). In brief, we do not believe resentencing would be pointless in this instance, for we discern the requisite "significant possibility" that the facts, as found by the sentencing court, would permit that court "lawfully to order a departure." Rivera, 994 F.2d at 953. Indeed, the district judge ______ himself observed that "[i]f it were open to me under the guidelines to depart, I would depart and I would impose a sentence of . . . probation." Because Rivera makes it possible ______ that such a departure is legally open to the sentencing court in 31 the unusual circumstances of this case, we think the course of prudence is to vacate the defendant's sentence and remand for resentencing.16 Cf. United States v. Tavano, ___ F.3d ___, ___ ___ _____________ ______ n.5 (1st Cir. 1993) [No. 93-1492, slip op. at 8 n.5] (remanding for resentencing and suggesting that, if there is "room for an objectively reasonable division of opinion on what the judge intended," the defendant should be given "the benefit of [the] doubt"). In adopting this course, we intimate no opinion either as to what appellant's sentence should be or as to whether the district court should sentence within or beneath the GSR. The judgment of conviction is affirmed, the defendant's The judgment of conviction is affirmed, the defendant's _______________________________________________________ sentence is vacated, and the case is remanded for resentencing. sentence is vacated, and the case is remanded for resentencing. ________________________________________________________________ The district court shall afford both parties an opportunity to The district court shall afford both parties an opportunity to _________________________________________________________________ supplement the sentencing record. supplement the sentencing record. ________________________________ ____________________ 16We also are tugged in this direction by our recognition that, at the original sentencing hearing, the prosecution agreed that probation would be an appropriate disposition. 32