UNITED STATES of America, Appellee,

v.

Neil Patrick COADY,
Defendant, Appellant.

No. 86–1676.

United States Court of Appeals,
First Circuit.

Argued Dec. 3, 1986.

Decided Jan. 13, 1987.

Paul Shechtman, for defendant, appellant.

James H. Leavey, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., was on brief, for appellee.

Before BOWNES, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

Neil Patrick Coady was indicted in the United States District Court for the District of Rhode Island on a single count of illicit distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). He was convicted by a jury on May 14, 1986, and thereafter sentenced. This proceeding ensued. We affirm.

I.

The facts, insofar as they are pertinent to this appeal, are susceptible of succinct summary. It is undisputed that, on the afternoon of September 19, 1983, three men assembled at a restaurant in North Smithfield, Rhode Island: Richard Scovel, Ronald Riccotti, and the appellant. There is little honor among evildoers: Scovel, who was posing as a prospective purchaser of the contraband, was in reality an undercover agent of the federal Drug Enforcement Administration (DEA), and Riccotti had lately become a government informant. Needless to say, the appellant was blissfully unaware of this role playing. The parties agree that Coady gave Riccotti a manila envelope in the parking lot of the pub, which Riccotti promptly handed to Scovel. The DEA agent placed the container in his automobile, and the trio went into the eatery and sat together in a booth.

After some desultory conversation, Scovel returned to his car, opened the envelope, and field-tested its contents. Satisfied that the white powder was in fact cocaine, he rejoined his quondam companions in the booth. Scovel then told appellant that the "stuff looked real good." Coady responded with considerable animation. He bragged about the purity of "his" cocaine, offered assurances that the drug was in plentiful supply, and boasted of intimate connections with the local gendarmerie. As Coady prattled on, Scovel delivered the agreed purchase price ($5,600) under the table to Riccotti—who proceeded to count it and pass some of the bills to the appellant.

Coady took the stand in his own behalf. He did not dispute the occurrence of the events narrated above, but attempted to blunt the force of those circumstances. First, he gave a rather involved account of how, on the day in question, he happened to be holding the manila envelope for Riccotti, without the slightest knowledge of what it contained. Next, he explained his presence at the scene; he drove there (innocently) with the envelope at Riccotti's request, and returned the envelope to its owner in the

parking lot. He acknowledged that the trio, himself included, entered the pub and occupied the booth. But, he swore that, when Scovel left temporarily to return to his car, Riccotti for the first time informed him that a cocaine deal was in progress. Riccotti, so Coady claimed, asked him to lie and pretend to be "running the whole operation;" Coady immediately agreed to do so. On this basis, the appellant brands all of his ensuing boasts to Scovel as falsehoods designed to paint the apocryphal picture that Riccotti (for some unexplained reason) wanted to create.

The accounts again converge. Shortly after Coady's rodomontade had run its course and the money had changed hands, Scovel and the appellant exchanged telephone numbers and the three men went their separate ways. Coady's indictment, trial, conviction, sentence, and appeal followed in due season.

### II.

■ The appellant complains, first, that the district court erred in failing to instruct the jury on the law of entrapment. For a variety of reasons, this initiative need not occupy us for long.

Coady testified in his own behalf at trial. When he was under vigorous cross-examination, defense counsel objected to the prosecutor's attempt to show the defendant's involvement in other drug deals as evidence of his predisposition to commit the offense charged. The district judge, at sidebar and out of the jury's earshot, properly inquired as to whether entrapment was in issue. The following colloquy ensued:

> MR. CARNESI[1]: I'm not offering it, sir.
> THE COURT: You're not. Entrapment is not an issue in this case[?]
> MR. CARNESI: No, sir.

The district judge, based on this representation, barred the government from inquir-

ing into Coady's criminal proclivities. At no time prior to the close of all the evidence did the defendant seek to reverse his position or to reopen the door which had been so firmly shut.

Coady's argument on this point boils down, quite simply, to the notion that his mid-trial disclaimer of an entrapment defense was no bar to his resurrection of the defense after all of the evidence had been heard. The government was prepared to show Coady's criminal predisposition by the introduction of proof which was at one and the same time highly probative and severely damaging. This evidence was excluded, at the appellant's behest, because of his concession that entrapment had no part to play in his defense. His later attempt to revive the issue (after it was too late for the government to present its proof) cannot be countenanced.

Even less plausible is the appellant's effort to fault the district court for failing to charge the jury on the (abandoned) entrapment defense. Given counsel's midtrial withdrawal of that issue from the case, and the prosecution's reliance on that representation, the judge had no choice other than to rule as he did. Coady seems not to have learned that "[h]aving one's cake and eating it, too, is not in fashion in this circuit." *United States v. Tierney,* 760 F.2d 382, 388 (1st Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).

There is yet another reason why Coady's first argument must fail: he presented insufficient evidence to justify an entrapment instruction. It is too plain to warrant citation of authority that a party is not entitled to a charge unless the record, viewed most charitably to the proponent of the instruction, furnishes an arguable basis for application of the proposed rule of law. We have previously hewed to this line as respects entrapment defenses. *E.g., United States v. Fera,* 616 F.2d 590, 596 (1st Cir.) (defendant not entitled to jury instruction on entrapment where no adequate eviden-

---

1. Carnesi was the appellant's trial attorney. Coady is represented by fresh counsel on this appeal.

tiary predicate was presented), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980).

▎ Entrapment does not blossom whenever a person succumbs to his own greed or to the lure of easy money: it blooms only when the crime for which the miscreant is subsequently charged was instigated by minions of the law *and* the offender had no previous disposition towards commission of the deed. *Id.* The initial burden of bringing to light some evidence of entrapment must be shouldered by the accused. *See Kadis v. United States,* 373 F.2d 370, 374 (1st Cir.1967). "A factual issue sufficient to require submission to a jury arises only if [the accused's] evidence amount[s] to more than a mere scintilla." *Fera,* 616 F.2d at 596. *See also United States v. Luce,* 726 F.2d 47, 49 (1st Cir.1984); *Kadis,* 373 F.2d at 373–74. Only if a defendant makes out a threshold showing that a government agent turned him from a righteous path to an iniquitous one does the government's obligation affirmatively to disprove entrapment mature. *See United States v. Rodrigues,* 433 F.2d 760, 761 (1st Cir.1970), *cert. denied,* 401 U.S. 943, 91 S.Ct. 950, 28 L.Ed.2d 224 (1971).

▎ As part and parcel of his entry-level burden, the defendant must adduce evidence tending fairly to show his unreadiness to commit the offense. *United States v. Espinal,* 757 F.2d 423, 425–26 (1st Cir. 1985); *United States v. Kakley,* 741 F.2d 1, 3 (1st Cir.), *cert. denied,* 469 U.S. 887, 105 S.Ct. 261, 83 L.Ed.2d 197 (1984); *Fera,* 616 F.2d at 596. None was forthcoming here. The record, even when viewed most hospitably to the appellant, indicates merely that Riccotti created a criminal opportunity by asking Coady to involve himself, and sweetened the pot with an offer of payment. The appellant, without more, leaped at the chance to participate. It is well settled that mere solicitation cannot be equated with entrapment, *Espinal,* 757 F.2d at 425, and that entrapment does not arise just because government agents resort to pre-

tense. *Fera,* 616 F.2d at 596. Here, Coady—even if his story was to be believed—proved nothing beyond these (insufficient) facts.

In sum, there was an utter absence of any evidence that the appellant was unprepared to commit the malefaction or that he was corrupted by any government agent. At most, law enforcement personnel furnished Coady with the occasion to perpetrate a crime which he was not otherwise undisposed to commit. He was, on any reasoned view of the record, no reluctant dragon snared by some impermissible duplicity on the part of the DEA. Quite the contrary, he was a willing participant. The district court was entirely correct in refusing to submit the entrapment issue to the jury.

### III.

The appellant's remaining asseveration centers on an allegedly erroneous view of the law espoused in the prosecutor's closing statement to the jury and uncorrected, so Coady argues, in the district court's instructions. Like a mirage in the shimmering heat of the desert, however, the contention cannot withstand close scrutiny.

In the opening segment of his summation, Fed.R.Crim.P. 29.1, the prosecutor suggested to the jurors that, even if they were to credit Coady's version of what had transpired, they could nevertheless find him guilty as an aider and abetter. When this observation was made, defense counsel raised no contemporaneous objection; instead, he proceeded to argue to the jury that the "distribution" to which criminal liability attaches, *see* 21 U.S.C. § 841(a)(1), had been completed, unbeknownst to the defendant, in the parking lot. Therefore, it was urged, Coady's subsequent posturing as a drug dealer could not possibly have aided and abetted the (already completed) crime. Not to be outdone, the prosecutor countered this suggestion during rebuttal, using a mercantile analogy set forth in the

margin.[2] Defense counsel protested at this point, but the court overruled the objection.

After closing arguments had been completed, the jury was charged. A stock instruction on the subject of aiding and abetting was given. Before the jury retired, the district court afforded counsel an opportunity to comment at sidebar. Commendably, the court cautioned the lawyers about the need carefully to spell out on the record any objections to the charge. *See* Fed.R.Crim.P. 30 ("No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection"). Nothwithstanding this flea in his ear, appellant's trial attorney offered only the following rejoinder: "The objections I would raise, sir, are most respectfully to the Court's charging of aiding and abetting [which] in this case I don't think is an appropriate charge."

■ At the outset, we note that this general objection to the aiding and abetting charge plainly fails to satisfy the requirements of Rule 30. The rule requires that litigants register their complaints about jury instructions at a time and in a (sufficiently particularized) manner that enables the trial judge intelligently to appraise the soundness of the position asserted, and if need be, correct the charge to avoid injustice. That counsel may have discoursed upon the nature of his theory at some time prior to the giving of the charge will not excuse noncompliance with the express mandates of Rule 30. *See McGrath v. Spirito*, 733 F.2d 967, 968–69 (1st Cir.1984) (discussing Fed.R.Civ.P. 51, the virtually identical civil analogue to Fed.R.Crim.P. 30).[3] As one court has noted, in a criminal

case, "[s]o strictly is the rule applied that a party who fails to make objection as required by the rule 'cannot rely on an assurance by the district court that his rights are saved.'" *United States v. Barrett*, 598 F.Supp. 469, 472 (D.Me.1984), *aff'd*, 766 F.2d 609 (1st Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985) (citation omitted).

Against this backdrop, Coady's present claim appears flimsy. He concedes that the district court's instructions represented an eminently correct statement of the law of aiding and abetting—as far as they went. He argues only that this charge (without more) reinforced an erroneous conception of the crime suggested by the prosecution in its summation. Yet, the appellant failed to make this point (for what, if anything, it might be worth) to the trial judge at the appropriate time. And, the tack which he did take—the idea that no instruction at all on aiding and abetting should have been uttered—is ludicrous. At best, if Coady's anecdotage was believed, there might have been some basis for a finding that he had not aided and abetted (*but see* discussion *post*). The jury, however, on any view of the case, was at liberty to disbelieve the appellant, credit the other (ample) evidence, and find him guilty as an aider and abetter. Mindful of that range of choices, the court below was duty bound to instruct on the aiding and abetting statute.

■ The contention that prejudicial error occurred in the course of the government's closing argument suffers a similar strain of procedural paralysis. As noted, defense counsel offered no objection to the prosecution's summation in chief. Indeed, counsel responded to the government's theory by way of argument in his own closing. An

---

**2.** The assistant United States Attorney declaimed:

"The third question raised by defense counsel was, well[,] the crime was all over apparently, the transaction had been made, the envelope had been given, Mr. Coady really had no part in it and anything he said was after the fact. That's like saying if you go into a store and you pick out an article of clothing, it's all

over, the store keeper expects something from you; and unless you're ready right there with the cash, that sale had not been completed, that transaction is not completed."

**3.** We have consistently applied the teachings of *McGrath* in the precincts patrolled by Fed.R. Crim.P. 30. *E.g., United States v. Tierney, supra*, at 389–90.

objection first surfaced when further reference to the topic was made during rebuttal. So, by any stretch of the imagination, the objection was untimely.

■ To be sure, even absent a seasonable objection, we could correct "plain error" in the interests of justice. *See United States v. Fuller,* 768 F.2d 343, 347 (1st Cir.1985); *United States v. Flaherty,* 668 F.2d 566, 595 (1st Cir.1981). In this case, however, we are unable to ascribe plain error to the government's characterization of appellant's aiding and abetting liability, or to the district court's action (or inaction) with respect to same. Indeed, if there was error in the prosecutor's recapitulation—a point which we need not decide—it plainly evaporated with the judge's repeated directives to the jury that it should consider the law only as articulated by the court. On this record, any error in failing to sustain the objection to the prosecutor's store merchant analogy was harmless beyond a reasonable doubt.

Not only is Coady's aiding-and-abetting point procedurally infirm; it is equally lacking in substantive merit. In essence, the appellant argues that commission of the crime of distributing a controlled substance, 21 U.S.C. § 841(a)(1), concluded when the cocaine physically changed hands in the parking lot. Coady's only conscious involvement in this nefarious affair, he alleges, occurred in his *subsequent* greasing of the transaction's financial gears. Inasmuch as a sale, per se, is not a necessary element of "distribution" under § 841(a)(1), this thesis runs, the appellant's conduct could not have "aided and abetted" the perpetration of the offense.

■ The appellant is correct when he observes that 21 U.S.C. § 841(a)(1) criminalizes "the actual, constructive, or attempted transfer" of a controlled substance, 21 U.S.C. §§ 802(8), 802(11), as opposed to its sale. An exchange of money is not a required element of the offense. *United States v. Workopich,* 479 F.2d 1142, 1147 n. 6 (5th Cir.1973). If the entire transaction which comprised the unlawful distribution had in fact ended prior to any culpable participation on Coady's part, it might well be that subsequent acts alone could not form the basis for aiding and abetting liability. *See Roberts v. United States,* 416 F.2d 1216, 1221 (5th Cir.1969); *United States v. Ferraro,* 414 F.2d 802, 804 (5th Cir.1969).

But, much of this dialectic is of academic interest only. Apart from the presence of procedural missteps which undercut his stance, *see ante,* the appellant reads the facts of this case in too inelastic a manner. In *Nye & Nissen v. United States,* 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949), the Supreme Court declared that "[i]n order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.'" *Id.* at 619, 69 S.Ct. at 769, quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938). While currency changing hands is not indispensable to a violation of § 841(a)(1), it cannot be gainsaid that the distribution of narcotics often—indeed, typically—takes the form of a sale. After all, "the love of money is the root of all evil," I Timothy 6:10, and drug trafficking is no exception. So, though one need not covet cash to be guilty of a § 841(a)(1) distribution, one may certainly aid and abet such a distribution—"associate [oneself] with the venture ... [so] that [one] seek[s] by [one's] action to make it succeed," *id.*—by facilitating the financial climax of the deal.

Such a proposition is no less true even if the assisting conduct happens to occur *after* the contraband has passed in the first instance from primary distributor to intended recipient. It would be both ironic and illogical to use Congress's expanded definitions of unlawful conduct (its criminalization of the broader inclusive acts of "distribution" and "dispensing," rather than the more restrictive act of "selling") to shrink

the liability of those who aid and abet violators in ways that go beyond the statutory minima of the offense's requisite elements.

 In the case before us, Coady unquestionably assisted a cocaine-for-cash transaction between Riccotti and Scovel. By his own testimony, he did so purposefully, donning the well-fitting garb of a drug dealer. Although the physical transfer of the contraband which occurred earlier in the parking lot may have been legally sufficient to trigger primary liability under § 841(a)(1), Coady cannot hypothesize so convenient a truncation of the tale. The fact of the matter is that this particular distribution did not end there. It had an inseverable financial dimension to it, and this aspect of the venture was not consummated until the appellant knowingly participated in bringing it to fruition.[4]

Coady's contention, artful though it may be, cannot absolve him of liability for aiding and abetting the distribution of a controlled substance. The district court properly instructed the jury on the elements of this crime, and committed no reversible error in overruling the appellant's belated objection to the prosecutor's closing argument.

## IV.

The appellant was fairly tried and fairly convicted. All of his assignments of error are meritless. The judgment of the district court is, therefore,

*Affirmed.*

4. Even were we inclined to accept the appellant's implausible versions of both the facts and the law, his conviction should nevertheless be upheld. On any view of the evidence, Coady lent his informed involvement to the deal well before any transfer can fairly be said to have concluded. According to the appellant, at the time Riccotti first divulged the true nature of the enterprise, Scovel was field-testing the cocaine. Not having parted with his dollars, the expected purchaser retained the option of aborting the deal if he was not satisfied with the contraband. It was only upon Scovel's return to the pub and Coady's ensuing assurances to him that the parties sealed their illicit bargain with greenbacks. Up until that point, Scovel's retention of the drugs was an open question, and no transfer—actual or constructive—had occurred. Scovel's situation was not unlike the prospective car buyer who takes the vehicle of his choice from the dealer's showroom for a test spin; his temporary possession of the goods was subject to defeasance unless (i) he was satisfied with the quality and value, and (ii) payment was made (or arranged).