For the foregoing reasons, the judgment is *affirmed.*

**UNITED STATES, Appellee,**

v.

**Daryl YOUNG, Defendant–Appellant.**

**No. 95–1746.**

United States Court of Appeals,
First Circuit.

Heard Dec. 4, 1995.

March 21, 1996.

David J. Van Dyke, by Appointment of the Court, with whom Berman & Simmons, P.A., Lewiston, ME, was on brief, for appellant.

Margaret D. McGaughey, Portland, ME, Assistant United States Attorney, with whom Jay P. McCloskey, Bangor, ME, United States Attorney, and Jonathan R. Chapman, Portland, ME, Assistant United States Attorney, were on brief, for appellee.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

TORRUELLA, Chief Judge.

Defendant-appellant Daryl Young ("Young") challenges his criminal conviction, as well as his resulting sentence imposed pursuant to the United States Sentencing Guidelines (U.S.S.G.). Young was convicted with co-defendant Dennis Johnson ("Johnson") (1) of conspiring to possess with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846, and (2) of possession of heroin with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). After the close of evidence in his jury trial, he waived his right to trial by jury and submitted to a verdict by the court. The district court found him guilty and sentenced him to ninety-two months' imprisonment, to be followed by five years of supervised release. We affirm both the judgment and the sentence of the district court.

## I. BACKGROUND

In December 1994, Young met Al Hendricks ("Hendricks") while the two men were enrolled in a drug detoxification program at a Maine hospital. At trial, Young testified that Hendricks constantly talked about drugs, disrupting Young's therapy. Young and Hendricks continued to communicate after Young had left the detoxification program. Shortly thereafter, starting on December 27, Hendricks, on his own initiative, taped twelve conversations with Young.

On the first tape, Young told Hendricks he had sent a car to retrieve twenty-one grams of an unspecified substance, and when Hendricks said he wanted some drugs, Young and Hendricks agreed on a meeting place. On January 5, 1995, Hendricks contacted the Drug Enforcement Agency (DEA). On January 9, 1995, Hendricks was formally enrolled as an informer. Subsequently, Hendricks and DEA Agent Henry J. O'Donoghue ("Agent O'Donoghue") arranged a deal whereby Young and Johnson would travel to the Bronx to purchase heroin, which they would then resell to Agent O'Donoghue (the "controlled buy"). On January 13, 1995, Young was arrested at the Greyhound Bus terminal in Portland, Maine, after he conveyed heroin to Agent O'Donoghue.

Although not included in the charge before it, at sentencing the district court included two other quantities of drugs under the rubric of relevant conduct pursuant to the United States Sentencing Commission's Sen-

tencing Guidelines. First, in November 1994, Officer Brian Higgins of the Maine State Police found Young unconscious in Machias, Maine, in an automobile owned by Johnson, and in possession of approximately 11 ounces of cocaine. The district court took this cocaine into account (the "Machias cocaine") in computing Young's sentence in the instant conviction. Additionally, Johnson testified that Young had sold him heroin for almost two years previous to Young's January 13, 1995, arrest. The district court also took this heroin into account (the "Johnson heroin") in computing Young's sentence in the instant conviction.

At trial, after the district court refused to instruct the jury on the defense of entrapment, Young waived his right to a jury trial, submitted to a verdict of the district court, and was convicted and sentenced.

## II.  DISCUSSION

### A.  The Requested Entrapment Instruction

■■■ Young challenges the district court's refusal to instruct the jury on his defense of entrapment. "[A] defendant is entitled to a jury instruction on entrapment if there is record evidence which fairly supports the claims of both government inducement of the crime and defendant's lack of predisposition to engage in it." *United States v. Rodríguez*, 858 F.2d 809, 814 (1st Cir.1988). The record must show "hard evidence," which if believed by a rational juror, "would suffice to create a reasonable doubt as to whether government actors induced the defendant to perform a criminal act that he was not predisposed to commit." *Id.* The

existence or nonexistence of the required quantity of evidence in a given case is a matter of law for the court, *see id.* at 809, and thus our review is plenary, reading the record evidence in the light most favorable to the defense. *See United States v. Tejeda*, 974 F.2d 210, 217 (1st Cir.1992); *Rodríguez*, 858 F.2d at 814. Once a defendant carries his or her entry-level burden, the government may prove the absence of entrapment by showing, beyond a reasonable doubt, "that the defendant was disposed to commit the criminal act prior to being first approached by government agents." *United States v. Gifford*, 17 F.3d 462, 468 (1st Cir.1994).

■■■ We conclude that even assuming all of Hendricks' acts could be considered government conduct,[1] the district court did not err in finding a lack of "hard evidence," which if believed by a rational juror, would suffice to create a reasonable doubt as to whether Hendricks committed acts that would meet the legal definition of entrapment.[2] To be entitled to the instruction on entrapment, a defendant must show hard evidence that, if believed, would lead a reasonable person to the requisite conclusion; it is not enough that there be doubt in the absence of evidence on a given point. *See United States v. Pratt*, 913 F.2d 982, 988 (1st Cir.1990); *Rodríguez*, 858 F.2d at 814. As we have previously stated,

> [i]f an accused suggests that entrapment belongs in the case, it seems not unfair to expect him to point to a modicum of evidence supportive of his suggestion. The alternative—that the prosecution be forced to disprove entrapment in every case— seems plainly unacceptable.

1.  Young argues that all of Hendricks' acts, dating from their first meeting, should come under the lens of entrapment's examination for improper government action that contaminated the prosecution. Young asserts that Hendricks intended *to become a government agent from the beginning*, when he befriended Young, and thus all of Hendricks' actions constitute the actions of a government agent. Relying on *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), Young contends that even though there is no "private entrapment" defense, *see United States v. Gendron*, 18 F.3d 955, 962 (1st Cir.1994) (collecting cases), because Hendricks may well have began his association with Young with a view towards turning government infor-

mant, the government "ratified" Hendricks' acts, including those committed before Hendricks first contacted O'Donoghue.

Because we find no hard evidence of inducement regarding even those of Hendricks' acts that pre-date his enrollment with the DEA, we assume the validity of Young's novel theory of entrapment by government ratification without ruling on it.

2.  We do not consider this definition with respect to O'Donoghue, because the record, including Young's testimony (described *infra*), shows that O'Donoghue had minimal contact with Young before the controlled buy that led to this appeal.

*Id.* at 813–14 (citations omitted). In the entrapment context, inducement must be such that it implicates concerns of government "overreaching," *see Gendron,* 18 F.3d at 962; solicitation alone does not suffice as inducement, *see id.* at 961. This court has previously stated that

> [a]n improper "inducement," however, goes beyond providing an ordinary "opportunity to commit a crime." An "inducement" consists of an "opportunity" *plus* something else—typically, excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive.

*See id.* (citation omitted) (emphasis in original). Examples of improper "inducement" include intimidation, threats, dogged insistence, and "arm-twisting based on need, sympathy, friendship, or the like." *United States v. Gifford,* 17 F.3d at 468; *see also Gendron,* 18 F.3d at 961.

The district court concluded that Young essentially testified that there was no inducement on the part of Agent O'Donoghue. Reviewing the record, we agree. In response to repeated questioning on cross-examination, Young failed to point to any statement or action of Agent O'Donoghue that Young considered inducement. In fact, by his own testimony, Young pinpointed the time of any inducement to his contact with Hendricks in the hospital. With respect to Hendricks, Young attempted to depict a pattern of inducement. Young testified that Hendricks allegedly induced him to sell narcotics by befriending him while both were in treatment, by telling "war stories," by "com[ing] into [his] hospital room," and by saying that he could arrange for Young to obtain drugs. Young testified that Hendricks allegedly led him into selling drugs by telling Young "to trust him," and that "[b]y just being there," Hendricks "was the answer to everything."

Even viewing the record most favorably to Young, we find that the district court properly found that Young did not produce "hard evidence" that Hendricks used coercion, intimidation or any promise of benefits other than the opportunity to commit the crime. Young's own trial testimony was that Hendricks' actions amounted to talking about drugs, referring to the availability of drugs, and arranging the purchase with O'Donoghue. There was no testimony or other evidence, let alone "hard evidence," of coercion or intimidation. *Cf., e.g., United States v. Becerra,* 992 F.2d 960, 963 (9th Cir.1993) (describing government officials who used threats against a defendant's family); *United States v. Groll,* 992 F.2d 755, 759 (7th Cir. 1993) (describing government officials who called every day and "began threatening" the defendant). Unlike in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), there was no evidence that Hendricks feigned physical suffering due to withdrawal symptoms. *Id.* at 373, 78 S.Ct. at 821. While there was testimony that Hendricks showed Young his track marks, there was no testimony by Young, nor any other evidence, of any attempt to attract sympathy in order to obtain drugs for Hendricks or O'Donoghue. With respect to coercion or emotional appeals to sympathy, then, we find no hard evidence in the record regarding the instant offense that would satisfy the required showing of inducement, that is, "opportunity plus something else."

Similarly, while there have been cases in which pleas based upon a defendant's friendship with an informant have justified a finding of entrapment, *see, e.g., Sorrells v. United States,* 287 U.S. 435, 440–41, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932) (using sentiment of "one former war buddy … for another" to get liquor during prohibition), there was no such evidence here. There was hard evidence, in the form of Young's testimony, from which a rational jury could have inferred a friendship with Hendricks, albeit a recently established one. There was no testimony from Young, nor was there any other hard evidence, that Hendricks made any plea based upon any degree of friendship that the two men had established during their brief acquaintanceship, which Young testified began on or about December 23, 1994, to encourage Young to do anything that he was not predisposed to do. We cannot find, and Young does not cite authority for, the proposition that friendship, without a plea predicated upon friendship, suffices legally as inducement; indeed case law suggests that, as

a matter of law, friendship alone does not constitute sufficient inducement. *See, e.g., United States v. Ford,* 918 F.2d 1343, 1348 (8th Cir.1990) (concluding that, "as a matter of law," evidence that a defendant thought he or she was doing a favor for a friend by selling that friend illegal drugs does not suffice for showing inducement to obtain entrapment instruction); *United States v. Jones,* 487 F.2d 676, 678 (9th Cir.1973) ("[f]riendship is not, by it sufficient inducement to constitute entrapment as a matter of law"). The sole evidence pertinent to how Hendricks purportedly managed to "lead" Young to selling drugs to Agent O'Donoghue is Young's testimony that Hendricks said "I have a friend that wants heroin and I will set you up." There is no accompanying allegation of coercion, threat, or plea based upon friendship or sympathy that would constitute more than mere opportunity, which alone cannot suffice legally as inducement. *See Gendron,* 18 F.3d at 961.[3]

Furthermore, while Young contends that Hendricks disrupted his drug treatment program by bringing up the subject of drugs in conversation, we can find no authority for the proposition that merely affording the opportunity for illegal activity can qualify legally as inducement simply because of the context, were Young to make such an argument. In fact, authority exists for the proposition that context is irrelevant where an informant's action was "nothing more than a solicitation to act." *United States v. Singh,* 54 F.3d 1182, 1189 (4th Cir.1995) (finding no inducement where former patient, acting as a government agent, convinced physician to write her prescription for pharmaceuticals, forming the factual basis of his conviction for distributing controlled substances outside the scope of his medical practice for other than legitimate medical purposes, and for falsifying prescription information); *see United States v. Mendoza–Salgado,* 964 F.2d 993, 1004

(10th Cir.1992) (finding no inducement and rejecting defendant's self-portrayal as "gullible alcoholic," finding dispositive that the record indicated that "the government informer did no more than advertise [an Agent's] interest in purchasing cocaine" and setting up the controlled buy). By contrast, the informant in *Sherman,* a case on which Young relies heavily, repeatedly sought drugs from the defendant in a treatment context, supplementing his recurring requests with claims of physical discomfort from withdrawal. *Sherman,* 356 U.S. at 371, 78 S.Ct. at 820 (noting that the defendant there tried to avoid the issue of illegal drugs "from the first," and "[n]ot until after a number of repetitions of the request, predicated on [the informant's] presumed suffering, did petitioner finally acquiesce").

Ultimately, while Young testified that Hendricks befriended him and brought up the subject of drugs, he never testified that Hendricks used this friendship as leverage constituting the "opportunity plus something else" legally required for a finding of inducement, *see Gendron,* 18 F.3d at 961. The December 27 recording, in fact, shows that Young was in the process of obtaining drugs before offering them to his friend Hendricks. In fact, at trial, Young provided the following summary of how Hendricks "led" him into selling drugs: "[b]y just being there, he was the answer to everything." Assuming, without concluding, that Hendricks was a government agent, we might find it distasteful that a government agent was even present talking about drugs in a detoxification center. But this circuit has never held, and we do not now hold, that the context in which government conduct occurs waives the defendant's burden to show hard evidence of legally sufficient inducement. Without the requisite evidence, as here, we conclude that the district court properly found that Young was not entitled to have a jury consider his entrap-

---

3. Accordingly, we need not consider the additional required finding of predisposition. However, we note that Hendricks' first tape, from December 27, 1994, contains strong evidence of Young's interest in providing drugs to Hendricks. Without any request from Hendricks, Young brings up the subject of a car "going in five minutes" that is going to obtain 21 grams of an unidentified substance that would be "enough for all of you." What hard evidence existed regarding predisposition suggests that not only did Hendricks not offer more than an opportunity, but also, in fact, that Young may already have been predisposed to sell or provide drugs to others, and that Young may have initiated the component of his relationship with Hendricks that involved the buying and selling of illegal drugs.

ment defense, and therefore we affirm the district court's decision.

## B. The Sentence

At sentencing, the district court found the total drug quantity attributable to Young to be equivalent to 284.41 kilograms of marijuana, resulting in a Base Offense Level of 26. *See* U.S.S.G. § 2D1.1(c)(7). In making this finding, the District Court found three distinct quantities of illicit drugs: (1) 17.96 grams of heroin involved in the controlled buy which formed the predicate for the prosecution (translating to 17.96 kg of marijuana equivalent); (2) 453 grams of cocaine representing drugs found on the defendant upon his arrest in Machias, Maine in November of 1994 (translating to 90.6 kg of marijuana equivalent); and (3) 176 grams of heroin representing drugs the district court found that Young had sold to Johnson over a two-year period preceding the subject prosecution (translating to 176 kg of marijuana equivalent).

On appeal, Young contends that the district court erred by including both the Machias cocaine and the Johnson heroin in calculating his sentence. According to Young, the circumstances surrounding the Machias cocaine and the Johnson heroin should not have been factored into "relevant conduct" for the purposes of his sentence, because sufficient nexus with his charged conduct did not exist.

To bring uncharged conduct into play, the government must show a sufficient nexus between the conduct and the offense of conviction by a preponderance of the evidence. *See United States v. Sklar*, 920 F.2d 107, 110 (1st Cir.1990). Absent a mistake of law, we review only for clear error the district court's conclusions that drugs were part of the same conduct or scheme or plan. *See id.* at 110–11.

Under the Sentencing Guidelines, "relevant conduct" includes all acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction[.]" U.S.S.G. § 1B1.3. For two or more offenses to be considered part of a common scheme or plan, "they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3, comment. (n. 9(A)).

We conclude that the circumstances surrounding the Machias cocaine and the charged offense[4] were part of a common scheme or plan because they evince at least two common factors: a common source for the drugs in New York and common transport of the drugs to Maine. In his appellate brief, Young concedes that he obtained both the Machias cocaine and the heroin involved in the charged offense from the same source in New York. Additionally, as in the charged offense, he apparently brought the drugs from there to Maine. Furthermore, at trial, agents testified that a subsequent search of his house turned up used and unused syringes, several sets of scales covered with white powder, marijuana, pills and other drug residue. Thus, there was evidence tending to tie the circumstances surrounding the Machias cocaine and the offense conduct together as part of a common scheme whereby Young conveyed drugs from his supplier in New York to buyers in Maine.[5]

---

4. Because we find proper the district court's inclusion of the Machias cocaine, we do not consider whether the Johnson heroin was correctly included, since even if the Johnson heroin were excluded, it would not change Young's base offense level or sentencing range. "[W]hen correction of a finding would not change the applicable offense level or affect the sentencing range, any error therein would necessarily be harmless." *United States v. Bradley*, 917 F.2d 601, 603 (1st Cir.1990).

5. Since we find that the Machias cocaine and the heroin involved in the charged offense form part of a common scheme or plan, according to

U.S.S.G. § 1B1.3, these drug quantities may be included together under the rubric of relevant conduct. Because § 1B1.3 requires a finding of either a "common scheme or plan" *or* the "same course of conduct," we do not consider Young's further contention that because the events surrounding the Machias cocaine were separated in time from the offense conduct by Young's self-admission into a detoxification center, these two incidents cannot be considered part of the same course of conduct under U.S.S.G. § 1B1.3(a)(2), because they cannot be considered part of a single episode, spree, or ongoing series of offenses. See U.S.S.G. 1B1.3, comment. (n. 9(B)).

Additionally, Young argues that the offense conduct involved selling cocaine to Agent O'Donoghue for expected further distribution in Canada, while assuming that if the Machias cocaine was to be resold, it would presumably be sold in Maine. Without concluding that different destinations require a finding that the incidents cannot be part of a common scheme or plan, we find this argument unconvincing given that the offense conduct involved selling drugs in Portland, Maine, and that apparently Agent O'Donoghue was to handle further distribution. Certainly, we do not believe that it was clear error for the district court to find a common scheme on these facts.

Furthermore, while Young testified that the Machias cocaine was all for his own use, the district court was not required to believe him. *See United States v. Brewster*, 1 F.3d 51, 54 (1st Cir.1993). In reviewing sentencing proceedings, as elsewhere, we must be mindful that "credibility determinations lie primarily within the realm of the district court," *id.* at 55, and where, as here, "there are two plausible views of the record, the sentencing court's adoption of one such view cannot be clearly erroneous," *id.* (citing *United States v. St. Cyr*, 977 F.2d 698, 701 (1st Cir.1992)). The district court's conclusion was particularly plausible here, where the court heard testimony from Maine DEA Supervisor Kenneth MacMaster that a typical dosage of cocaine for personal use ranges from one-tenth to one-fourth of a gram, and that a total of 453 grams of cocaine were seized from the car, which, together with scales and other paraphernalia found at Young's home, suggested further distribution.

## CONCLUSION

As a result of the foregoing, the judgment of the district court is *affirmed.*