[NOT FOR PUBLICATION--NOT TO BE CITED AS PRECEDENT]
 United States Court of Appeals
 For the First Circuit

No. 99-1247

 UNITED STATES,

 Appellee,

 v.

 RAMON PENA,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Michael A. Ponsor, U.S. District Judge]

 Before

 Boudin, Stahl, and Lipez
 Circuit Judges.

 Charles W. Groce, III for appellant.
 Kevin O'Regan, Assistant United States Attorney, with whom
Donald K. Stern, United States Attorney, was on brief for appellee.

November 16, 1999

STAHL, Circuit Judge. After a five-day jury trial,
defendant-appellant Ramon Pena was found guilty of having violated
21 U.S.C. 841(a), which makes it unlawful "knowingly or
intentionally . . . [to] manufacture, distribute, or dispense, or
possess with intent to manufacture, distribute, or dispense, a
controlled substance." Pena challenges (1) the district court's
failure to instruct the jury on the defense of entrapment, and (2)
the court's denial of his motion for acquittal as a matter of law
based on the entrapment defense. We reject both arguments, and
therefore affirm.
 I.
 Factual and Procedural Background
Pena, a native of the Dominican Republic, emigrated to
Puerto Rico in 1985, leaving behind a wife and five children. In
1989, he moved to New York City, and in 1992, he relocated to
Springfield, Massachusetts.
Upon arriving in Springfield, Pena began to work at a
convenience store. During this time, he sent funds to support his
family in the Dominican Republic. After about eight months, Pena
was injured in an automobile accident which left him unable to
work. He soon began to use marijuana and to traffic in controlled
substances. 
In July, 1995, Pena pleaded guilty to various drug-
related state offenses, as well as two counts of illegal possession
of a firearm. He served two years in prison in Ludlow,
Massachusetts. Pena's I-551 Permanent Resident Card (commonly
called a "green card") and all of his possessions were seized upon
arrest.
After his release from prison in July 1997, Pena moved in
with his nephew in Springfield -- an apparent drug dealer -- and
began to search for a job. According to Pena, because he was
unable to reclaim his green card upon release, he was limited to
menial employment. Pena ultimately found work as a welder, earning
approximately $150.00 per week. He sent about $100.00 to his wife
and children in the Dominican Republic each week after he had
attempted, unsuccessfully, to bring them to the United States in
order to alleviate their financial difficulties.
Because Pena's claim of entitlement to a jury instruction
on entrapment requires us to view the evidence in the light most
favorable to the defendant, see, e.g., United States v. Gamache,
156 F.3d 1, 9 (1st Cir. 1998) -- and because, as described below,
our resolution of that claim renders further inquiry unnecessary --
the following account of the events leading to Pena's conviction is
taken entirely from Pena's own testimony. 
During the summer of 1997, while walking to work, Pena
encountered Julia Cruz, who lived on the corner of his street. 
Unbeknownst to Pena, Cruz was a confidential government informant. 
During their first meeting, Cruz never broached the subjects of
drugs or drug sales. Asked at trial whether he told Cruz anything
about himself at that point, Pena testified that "[a]ll I just told
her was that I was looking for a [better] job and that I needed my
green card, that I hadn't gotten it back from the police and that
I was looking for a job. I needed it because I needed to help my
family because I had been in jail . . . two years." 
The next time the two met, Cruz asked Pena into her
house, where she told him that she was hoping to "sell drugs for a
Dominican" and that "she wanted to get drugs [to] sell." Pena
"told her that [he] wasn't involved in that, that [he] wasn't going
to do that," and that he "had been in jail . . . [and as a result]
was going to do something else [for a living]."
Cruz and Pena continued to exchange pleasantries as Pena
walked to work each day. Finally, Cruz again invited Pena into her
home. There, she "told [Pena] she wanted [him] to help her," and
asked whether he had "some friends out there who sell drugs[.]" 
Pena told her that he "had a friend [who worked with drugs] but
[again said] that [he] wasn't . . . going to do that anymore." 
Nonetheless, Pena did contact Omar Almanso, a friend from prison
who, after his release, had resumed his commerce in illegal drugs. 
Almanso refused to deal with Cruz. Cruz then suggested to Pena
that they could both make money if Pena would help her sell drugs
instead. Pena testified that Cruz did not threaten him in any way.
Pena agreed to help her. When asked to explain his
decision, Pena testified at trial that "[e]ach time I called [my
family] I wouldn't be able to help my children. I didn't have any
work to help them buy their books, to buy what they needed, and so
they had to use borrowed books for school." 
Two weeks later, Cruz hailed Pena as he walked past her
home. She told him that she needed to speak with him about
something "urgent." Cruz told Pena "she had a customer for [him]
who had been a customer of hers before, and that [Pena and Cruz]
could sell to him and that [Pena] should go and that [they] would
both earn something from it." In fact, Cruz's "buyer" was Agent
John Jusino of the Chicopee, Massachusetts Police Department. Pena
went to Almanso, who sold him one hundred (100) bags of heroin for
$500.00. Pena and Cruz agreed to resell the heroin for $650.00. 
This price included a $100.00 profit for Pena and a $50.00 profit
for Cruz.
On October 6, 1997, Cruz called Pena to tell him that her
"buyer" would meet them the next day and that Pena should come to
her house so that the two could go together to make the sale. On
October 7, Pena walked to Cruz's house, and the two then drove to
meet Jusino. During their meeting, Jusino told Pena that in
addition to heroin, he was also interested in buying cocaine. Pena
replied that he had a friend from whom he could obtain cocaine. 
The two executed the sale. Pena kept his $100.00 profit and gave
$50.00 to Julia.
Following the initial meeting with Jusino, Pena obtained
a beeper to facilitate subsequent sales. Pena and Jusino met five
more times, during which the former sold the latter heroin and, on
one occasion, crack cocaine. Pena and Cruz divided the proceeds of
all six sales. Almanso supplied Pena with almost all of the drugs
Pena sold, but on one occasion, Pena obtained heroin from the
nephew with whom he was living.
During his meetings with Jusino, Pena spoke knowledgeably
about the various drugs his supplier offered. He told Jusino that
he could obtain heroin, cocaine, and crack cocaine. Asked at trial
how he knew about these drugs, Pena replied that Almanso "had all
of those and thought that [Pena] might need to sell [them] to [his]
customers." On one occasion, when Jusino questioned the quality
of the heroin, Pena admits that he replied, "No, no, no, this is
good. My bosses can't handle all the orders. . . . This is good
and guaranteed, you're going to call again."
During their sixth and final meeting, Jusino arrested
Pena. Pena was tried and convicted on five counts of having sold
controlled substances in violation of 21 U.S.C. 841. This
appeal followed. II.
 Discussion
Pena argues first that he was entitled to acquittal, as
a matter of law, based upon the entrapment defense, and second that
even if he was not so entitled, the district court erred in
refusing to instruct the jury on that defense. 
Both of Pena's claims hinge on the particular elements of
the entrapment defense. "[A] valid entrapment defense has two
related elements: government inducement of the crime, and a lack of
predisposition on the part of the defendant to engage in the
criminal conduct." Mathews v. United States, 485 U.S. 58, 63
(1988); see also United States v. Acosta, 67 F.3d 334, 337 (1st
Cir. 1995) ("The legal tests for entrapment are well established. 
What is required is (1) that the government induce the offense and
(2) that the defendant not be predisposed to commit it."); United
States v. Gifford, 17 F.3d 462, 468 (1st Cir. 1994); United States
v. Pratt, 913 F.2d 982, 988 (1st Cir. 1990). Even if Pena's
testimony were assumed to be entirely truthful, he has failed to
state facts sufficient to satisfy the "inducement" prong. We
therefore affirm the district court's rulings.
A. Pena's Entitlement to an Entrapment Instruction
Before discussing the merits of Pena's claim, we first
address the legal standards involved. In evaluating a district
court's refusal to instruct the jury as to the entrapment defense,
the question we must ask is whether the defendant has put forth
evidence which, if viewed in the light most favorable to the
defense, could prompt a reasonable juror to find that both prongs
of the entrapment test have been met. See, e.g., Gamache, 156 F.3d
at 9 (concluding that a defendant is "entitled to an instruction on
his theory of defense so long as the theory is a valid one and
there is evidence in the record to support it"); United States v.
Hernandez, 995 F.2d 307, 313 (1st Cir. 1993) (holding that in order
to merit an entrapment instruction, a defendant must "produce[]
some evidence -- on both elements of the entrapment defense --
sufficient to raise a reasonable doubt as to whether he was"
entrapped); United States v. Rodriguez, 858 F.2d 809, 814 (1st Cir.
1988) (requiring "hard evidence" supporting both prongs). The
initial burden of producing evidence sufficient to establish the
two entrapment prongs falls on the defendant. "If an accused
suggests that entrapment belongs in the case, it seems not unfair
to expect him to point to a modicum of evidence supportive of his
suggestion. The alternative -- that the prosecution be forced to
disprove entrapment in every case -- seems plainly unacceptable." 
Rodriguez, 858 F.2d at 813-14; see also United States v. Coady, 809
F.2d 119, 121 (1st Cir. 1987); Kadis v. United States, 484 F.2d
370, 374 (1967). The issue, then, turns on the sufficiency of the
evidence put forth by the defense. See Rodriguez, 858 F.2d at 814
("[T]he accused's burden is measured by the . . . sufficiency-of-
the-evidence yardstick."). 
Although the requisites for entitlement to an entrapment
instruction are far from taxing, a defendant's threshold burden
cannot be met by conclusory assertions alone; only "hard evidence
in the record which, if believed by a rational juror, would suffice
to create a reasonable doubt as to whether government actors
induced the defendant to perform a criminal act that he was not
predisposed to commit" will suffice. Rodriguez, 858 F.2d 814
(emphasis added); see also United States v. Gifford, 17 F.3d at 467
(emphasizing the defendant's "'entry-level burden' of showing that
'the record, viewed most charitably to the proponent of the
instruction, furnishes an arguable basis' for an assertion of the
defense." (quoting Rodriguez, 858 F.2d 809, 812-13)). The evidence
need not be "'so substantial to require, if uncontroverted, a
directed verdict of acquittal [but] it must be more than a mere
scintilla.'" Pratt, 913 F.2d at 988 (quoting Kadis, 373 F.2d at
374); see also Gifford, 17 F.3d at 467; Rodriguez, 858 F.2d at 814. 
Where the facts, viewed in the light most favorable to the
defendant, fail to satisfy the legal requisites for the entrapment
defense, no instruction is warranted.
In light of these standards, we review the decision below
de novo: "The existence or nonexistence of the required quantity
of evidence in a given case is a matter of law for the court, and
thus our review is plenary, reading the record evidence in the
light most favorable to the defense." United States v. Young, 78
F.3d 758, 760 (1st Cir. 1996); see also Rodriguez, 858 F.2d at 814. 
1. The Inducement Prong
As stated above, a defendant who asserts the entrapment
defense must first prove that the government "induced" his criminal
conduct. "[I]nducement requires something more than that a
government agent or informant suggested the crime and provided the
occasion for it. Rather, inducement 'consists of [providing] an
"opportunity" plus something else -- typically, excessive pressure
by the government . . . or the government's taking advantage' of
the defendant in an improper way." Acosta, 67 F.3d at 337 (quoting
United States v. Gendron, 18 F.3d 955 (1st Cir. 1994)); see also
Young, 78 F.3d at 761; Pratt, 913 F.2d at 988 ("[The] defendant
must make a showing 'that a government agent turned him from a
righteous path to an iniquitous one.'" (quoting Coady, 809 F.2d at
122)).
 It is well established that
 it is proper (i.e., not an "inducement") for
the government to use a "sting," at least
where it amounts to providing a defendant with
an "opportunity" to commit a crime. Without
this kind of law enforcement weapon, it would
often prove difficult, or impossible, to stop
certain seriously criminal activity,
particularly activity involving drugs, or
corruption, or other crimes in which no direct
participant wants the crime detected.
Gendron, 18 F.3d at 961 (internal citations omitted); see also
Mathews v. United States, 486 U.S. 58, 66 (1988) ("[E]vidence that
Government agents merely afforded an opportunity or facilities for
the commission of the crime would be insufficient to warrant [an
entrapment] instruction."); Pratt, 913 F.2d at 989 ("The fact that
[a government agent] put up the pretense of being a drug dealer,
and solicited [defendant's] business, does not, without more, make
the government's involvement rise to the level of entrapment.");
Coady, 809 F.2d at 122 (finding no improper inducement where
government agent merely "created a criminal opportunity by asking
[defendant] to involve himself, and sweetened the pot with an offer
of payment"). 
In order for a sting to constitute entrapment, then, the
government must engage in some kind of coercion -- the "something
else" alluded to in Acosta. In Gendron, we reviewed examples of
conduct that courts had considered "improper." Inducement was
found
 where government officials: (1) used
"intimidation" and "threats" against a
defendant's family; (2) called every day,
"began threatening" the defendant, and were
belligerent; (3) engaged in a "forceful"
solicitation and "dogged" insistence until
[defendant] capitulated"; (4) played upon
defendant's sympathy for informant's common
narcotics experience and withdrawal symptoms;
(5) played upon sentiment on "one former war
buddy . . . for another" to get liquor (during
prohibition); (6) used "repeated suggestions
which succeeded only when defendant had lost
his job and needed money for his family's food
and rent; (7) told defendant that she (the
agent) was suicidal and in desperate need of
money.

Gendron, 18 F.3d at 961-62 (internal citations omitted); see also
Acosta, 67 F.3d at 338 (requiring evidence of threats, "improper
appeals to sympathy, promises of extravagant reward, or . . .
relentless and extreme trickery"); Gifford, 17 F.3d at 468 (noting
that inducement involves "pleading with a defendant," "using
inherently coercive tactics," or "arm-twisting based on need,
sympathy, friendship, or the like"). 
In light of the principles governing the entrapment
defense and of these examples of governmental overreaching, we
direct our inquiry to whether Pena offered evidence sufficient to
mandate an entrapment instruction to the jury. We conclude that he
did not.
Pena's entrapment defense is based on the following
assertions: Cruz befriended him, mentioning on their first meeting
that she was looking to procure drugs for resale. Pena told her he
was not involved in such matters. When, on a later visit, she
asked him whether she might obtain drugs from a friend of his, he
agreed to inquire. That friend declined, but when Cruz then asked
Pena to sell narcotics as her partner, he agreed -- without any
coercion whatsoever -- and proceeded to engage in a total of six
sales before his arrest. Asked why he assented to Cruz's offer,
Pena cited only his children's need for new, rather than borrowed,
books. 
These facts simply could not support a finding of
improper "inducement." Cruz and Agent Jusino did, of course,
provide Pena with an opportunity to commit the crimes for which he
was convicted. But as we have stated, such behavior does not,
absent further coercion, constitute inducement. Pena describes no
such coercion here. The activities in which Cruz and Jusino
engaged fail even arguably to match the examples of misconduct
cited in Gendron. No witness testified that either Cruz or Jusino
employed "intimidation" or "threats," that either played upon
Pena's common narcotics experiences or any other form of sentiment,
or that either told Pena they were suicidal and in desperate need
of drugs or money. See Gendron, 18 F.3d at 961-62. Even those
cases cited in Gendron which bear some resemblance to the facts
before us differ in critical respects. Pena's testimony contained
no support for a finding that the government made "repeated
suggestions" that he could earn money by dealing drugs. See
Gendron, 18 F. 3d at 961; see also Acosta, 67 F.3d at 338 (finding
that entrapment instruction would be required when government
perpetrated a "campaign of persistent [telephone] calls" in its
attempt to lure defendant into committing an offense"). In fact,
Pena testified that although he initially expressed a hesitance to
become involved in drugs, when Cruz actually suggested at a later
date that the two could make money by selling narcotics together,
he agreed without resisting. Moreover, there is no hint that Cruz
"called [Pena] every day, 'began threatening' [him], and [was]
belligerent." Gendron, 18 F.3d at 961 (citing United States v.
Groll, 992 F.2d 755, 759 (7th Cir. 1993)). Individually, the
Gendron examples each evidence far more coercive government
activity than was present in this case; collectively, they
demonstrate that even as Pena states the facts, the government's
activities could not be held to constitute improper inducement.
The facts of Pena's case fall much closer to those in
United States v. Young, 78 F.3d 758 (1st Cir. 1996). Defendant
Young claimed he had met and become friendly with one Al Hendricks
while both were enrolled in a narcotics detoxification program. 
Hendricks insisted upon talking about drugs both during the program
and after its termination. Hendricks ultimately told Young that he
wanted to obtain certain controlled substances, and Young agreed to
supply him. The two agreed that they would together purchase and
resell heroin. But unbeknownst to Young, Hendricks had become a
government informant, and the "buyer" Hendricks "found" was a DEA
agent. Upon making the sale, Young was arrested. See id. at 759.
At Young's trial, the district court refused to instruct
the jury on the entrapment defense. Young appealed. See id. at
760. We affirmed, finding that Young "never testified that
Hendricks used [their] friendship as leverage constituting the
'opportunity plus something else' legally required for a finding of
inducement," or that Hendricks otherwise pressured him. Id. at
762.
Pena's case largely mirrors Young's. Cruz befriended
Pena, as Hendricks had befriended Young. Cruz and Pena discussed
drugs. Ultimately, Cruz proposed that she and Pena together sell
drugs to a buyer who was, in fact, a government agent -- just as
Hendricks had proposed to Young. Neither Pena nor Young testified
that the informant took advantage of any bond of friendship in
encouraging the sale. Like Young, Pena cannot claim that he was
"induced" by a government informant's actions. We conclude here,
as we did in Young, that "[t]here was no testimony or other
evidence, let alone 'hard evidence,' of coercion or intimidation." 
Id. at 761. 
Furthermore, we are unpersuaded by Pena's contention that
his family's financial needs transformed what would have been a
permissible government operation into illegal entrapment. First,
it is far from clear that Pena presented sufficient evidence to
ground a belief that the government was even aware of those
financial needs. The entirety of the testimony offered on this
matter was the following exchange between Pena and his counsel
concerning Pena's first meeting with Cruz:
 Q: Well, did you tell her anything about
yourself that particular . . . time?

 A: All I just told her was that I was looking
for a job and that I needed my green card,
that I hadn't gotten it back from the police
and that I was looking for a job. I needed it
because I needed to help my family because I
had been in jail in Ludlow two years.
Although Pena testified more specifically at trial about his
family's financial circumstances, he never testified that he had
informed Cruz of these circumstances. Pena's family's hardship
could not be found to contribute to an entrapment finding if the
government was not even aware of that hardship during its
undercover operation.
Even if the government had been aware of Pena's financial
situation, however, such hardship does not have the legal effect
Pena suggests. Pena's argument rests on his contention that he
agreed to sell drugs with Cruz only because he "didn't have any
work to help [his children] buy their books, to buy what they
needed, and so they had to use borrowed books for school." But as
we stated in United States v. Panet-Collazo, 960 F.2d 256 (1st Cir.
1992), "[e]ntrapment does not blossom whenever a person succumbs to
his own greed or to the lure of easy money." Id. at 259 (quoting
United States v. Coady, 809 F.2d 119, 121 (1st Cir. 1987)). 
Although one could be sympathetic to Pena if his children had been
in a dire situation, their need for new, rather than borrowed,
books is hardly sufficient to establish "inducement" where none
existed otherwise.
2. The Predisposition Prong
Because we find no improper inducement, we need not
determine whether Pena was predisposed to commit the crimes in
question. The government argues that the evidence regarding
predisposition was such that the entrapment defense would fail as
a matter of law on that ground alone. But the district court did
not appear to rely on this ground, and, in light of Pena's failure
to meet the requirements of the "inducement" prong, we need not do
so either. Pena's inability to raise evidence sufficient to ground
a finding of improper inducement alone rendered a jury instruction
on the entrapment defense inappropriate. 
B. Entrapment as Matter of Law
In ascertaining whether a defendant established
entrapment as a matter of law, we review the record de novo, see
United States v. Ellis, 168 F. 3d 558, 561 (1st Cir. 1999), to
determine whether it contains "undisputed facts" demonstrating
entrapment. Tzimopoulos v. United States, 554 F.2d 1216, 1217 (1st
Cir. 1977); see also Jacobson v. United States, 503 U.S. 540, 554
(1992). Having found that Pena has failed to present evidence even
permitting a finding of improper inducement, we naturally decline
to find that the same evidence required such a finding. For the
reasons described in Part II.A, supra, Pena has not established
entrapment as a matter of law.
 III.
 Conclusion
Pena failed to introduce evidence sufficient to ground a
finding that he was "induced" to commit the offenses underlying his
convictions. For this reason, the district court properly refused
to instruct the jury on the entrapment defense and properly denied
Pena's claim of entrapment as a matter of law.
Affirmed.